.                  **IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LARRY PITTMAN, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | Case. No. 1:13-cv-01019-JDB-egb |
| v. | ) | |
| | ) | |
| JAMES HOLLOWAY, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

**ORDER DIRECTING CLERK TO MODIFY THE DOCKET,**
**DENYING MOTION PURSUANT TO 28 U.S.C. § 2254,**
**DENYING CERTIFICATE OF APPEALABILITY,**
**CERTIFYING APPEAL WOULD NOT BE TAKEN IN GOOD FAITH,**
**AND**
**DENYING LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL**

Before the Court is the Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a

Person in State Custody ("§ 2254 Petition") filed by *pro se* Petitioner Larry Pittman, Tennessee

Department of Correction number 103695, an inmate at the West Tennessee State Prison

("WTSP") in Henning, Tennessee. (§ 2254 Pet., *Pittman v. Lester*[1] No. 2:12-cv-02931-STA-tmp

(W.D. Tenn.), ECF No. 1.) For the reasons stated below, the Court DENIES the § 2254 Petition.


**I.      BACKGROUND**

**A.   State Court Procedural History**

On February 27, 2006, a grand jury in Madison County, Tennessee, returned a three-count

indictment against Pittman and Joshua Irvin. (Indictment, *State v. Pittman*, No. 06-161 (Madison

_____

[1]The Clerk is directed to substitute current WTSP Warden James M. Holloway for Jerry
Lester as respondent in this action. *See* Fed. R. Civ. P. 25(d).

Cnty. Cir. Ct.), Page ID 83, ECF No. 9-1.)   Count 1 charged Pittman and Irvin with aggravated

robbery, in violation of Tennessee Code Annotated ("T.C.A.") § 39-13-402.   Count 2 alleged

Pittman and Irvin conspired to commit aggravated robbery, in violation of T.C.A. § 39-12-103.

Count 3 charged Pittman with especially aggravated kidnapping, in violation of T.C.A.

§ 36-13-305.   The events at issue occurred on or about November 27, 2005.

On April 11, 2006, the State filed a notice seeking an enhancement punishment for

Pittman, citing the following previous convictions:

1. Pled guilty to Armed Robbery (Incident date 10/7/71).

2. Pled guilty to Robbery with deadly weapon (Incident date 9/18/72) and was
   sentenced to 20 years.

3. Pled guilty to Assault & Battery & Possession of Deadly Weapon (Incident
   date 8/3/78).

4. Pled guilty to 1st Degree Burglary, Attempt to Commit Felony with use of
   firearm, & Possession Illegal Weapon (Incident date 12/3/78).

5. Pled guilty to Larceny of Vehicle (Incident date 4/15/80).

6. Pled guilty to 2nd Degree Burglary (incident date 9/3/80).

7. Pled guilty to Armed Robbery & Aggravated Assault w/ gun with intent to
   Murder (Incident date 3/14/84) and was sentenced to life.

8. Pled guilty to Armed Robbery (Incident date 6/15/84).

(Not. of Request for Enhanced Punishment, *id.*, Page ID 91, ECF No. 9-1.)

On May 2, 2006, Pittman, through his counsel, Joseph Howell, filed a Motion to Suppress,

arguing that the "all statements, objects, and evidence seized and/or obtained by the State during

and following the warrantless arrest of his person" should be suppressed, as violating the Fourth

Amendment of the United States Constitution and Article I, Section 7 of the Tennessee

Constitution.   (Mot. to Suppress, *id.*, Page ID 94-99, ECF No. 9-1.)   After a hearing held on June

2

6, 2006, the trial court entered an order denying the motion on June 16, 2006.   (Order Denying Mot. to Suppress, *id*., Page ID 103-104, ECF No. 9-1.)

On August 9, 2006, the State filed a second notice requesting an enhanced punishment for Petitioner, citing the following incidents as reasons for the enhancement:

1. Pled guilty to Robbery by use of a deadly weapon (Incident date 4/71) and sentenced to 15 years.

2. Pled guilty to Robbery by use of a deadly weapon (Incident date 10/71) and sentenced to 20 years.

(Second Not. of Request for Enhanced Punishment, *id*., Page ID 107, ECF No. 9-1.)

On September 11, 2006, a Consent Order to Withdraw and Substitute Counsel was entered and Benjamin C. Mayo was retained as counsel for Pittman.   (Consent Order to Withdraw and Sub. Counsel, *id*., Page ID 108, ECF No. 9-1.)   On October 4, 2006, Petitioner, through his new counsel, filed a Motion for Continuance of Trial, arguing that new exculpatory evidence had been discovered and needed to be examined before trial.   (Mot. for Continuance for Trial, *id*., Page ID 112-113, ECF No. 9-1.)   A jury trial on the charges against Pittman commenced in the Circuit Court of Madison County on October 4, 2006.   Before jury selection, the trial judge conducted a hearing on the motion for continuance, and at its conclusion, denied the motion.   (Trial Tr., *id*., Page ID 183-85, ECF No. 9-2).   On October 5, 2006, the jury returned a guilty verdict on all three counts.   (Trial Tr., *id*., Page ID 744-45, ECF No. 9-5.)

On October 10, 2006, the State filed a motion for consecutive sentencing, requesting that Counts 1-3 be served consecutive to each other and also consecutive to the sentence Pittman was currently serving (Mot. for Consecutive Sentencing, *id*., Page ID 114, ECF No. 9-1); a motion to

apply enhancement factors[2] (Mot. to Apply Enhancement Factors, *id.*, Page ID 115, ECF No. 9-1); and a motion to deem Pittman a "dangerous offender" (Mot. to Deem Def. "Dangerous Offender," *id.*, Page ID 116, ECF No. 9-1). On November 1, 2006, Pittman filed a Notice of Mitigating factors, arguing that his conduct did not cause or threaten serious bodily injury. (Not. of Mitigating Factors, *id.*, Page ID 140, ECF No. 9-1.) At a sentencing hearing on November 11, 2006, the trial judge sentenced Pittman to nineteen years for aggravated robbery, nine years for conspiracy to commit aggravated robbery, and thirty-eight years for especially aggravated kidnapping; all to be served consecutively. (Sentencing Hr'g Tr., *id.*, Page ID 1116-26, ECF No. 9-10.) Judgment was entered on November 15, 2006. (J., *id.*, Page ID 141-43, ECF No. 9-1.)

On December 18, 2006, Pittman filed a motion for judgment of acquittal or for a new trial. (Mot. for J. of Acquittal or New Trial, *id.*, Page ID 144, ECF No. 9-1.) A hearing was held on January 31, 2007, and at its conclusion, the judge overruled the motion. (Mot. for New Trial Hr'g

---

[2]The following enhancement factors were introduced in the motion:

(2)     The defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range;

(3)     The defendant was a leader in the commission of an offense involving two (2) or more criminal actors;

(9)     The defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community;

(12)     The felony resulted in death or bodily injury or involved the threat of death or bodily injury to another person and the defendant has previously been convicted of a felony that resulted in death or bodily injury;

(14)(B)The felony was committed while on any of the following forms of release status if such release is from a prior felony conviction:

(B)     Parole.

4

Tr., *id*., Page ID 1155, ECF No. 9-11; Order Denying Mot. for J. of Acquittal or New Trial, *id*., Page ID 150, ECF No. 9-1.) Pittman filed a notice of direct appeal to the Tennessee Court of Appeals ("TCCA") on March 7, 2007. (Not. of Appeal, *id*., Page ID 152, ECF No. 9-1.) On November 27, 2007, Pittman filed his brief to the TCCA, arguing the following:

1. Whether the trial court erred by denying the motion to suppress the fruits of the unlawful seizure and search of the defendant's person, where such was performed without a warrant and without probable cause?

2. Whether plain error was committed when the trial court refused to grant Defendant's Motion for Continuance when new and potentially exculpatory evidence was disclosed on the eve of trial?

3. Whether the evidence was sufficient to support a finding of guilt, where the proof failed to establish the identity of the culprit beyond a reasonable doubt?

4. Whether the court improperly sentenced the defendant by failing [to] require proof of sentencing factors beyond a reasonable doubt?

(Br. on Appeal of Right, *id*., Page ID 1178-97, ECF No. 9-12.) The TCCA affirmed Pittman's convictions. *State v. Pittman*, No. W2007-00589-CCA-R3-CD, 2009 WL 1025870 (Tenn. Crim. App. Apr. 7, 2009), *appeal denied* (Tenn. Nov. 12, 2010).

In upholding the convictions, the TCCA summarized the evidence as follows:

At trial, Officer Richard Newbill with the Jackson Police Department testified that at around 11:30 p.m. on November 27, 2005, he was dispatched to a robbery call at a Lone Star Steakhouse in Jackson. Officer Newbill said that he was the first police officer to arrive at the restaurant. Upon arriving at the restaurant, the officer interviewed the restaurant manager, Micki Rhodes, who had been present when the restaurant was robbed. According to Officer Newbill, the victim's demeanor was "shaken up" and "scared," but she was still able to relate that after the restaurant had closed, a man dressed in black and carrying a knife "grabbed her by the neck area and took her . . . to the office or wherever they keep the money" and had her remove the money from the safe. The assailant then placed the victim in the restaurant's walk-in cooler, where she remained for some time before calling 911. According to Officer Newbill, the victim said that the robber was wearing "[a] black ski mask, black like large-type black jacket, [and]

5

black pants." Officer Newbill testified that he observed bruises on the victim's neck; the victim told the officer that she received those bruises when the robber grabbed her by the neck. The victim also said that the robber took approximately $5200 from the restaurant's safe.

On cross-examination, Officer Newbill said that in his police report, he indicated that the robbery occurred between 11:10 and 11:20 that evening. He said that in his report, he described the black mask the robber wore over his face as a ski mask, which was the description provided by the victim. He indicated that he did not recall whether the victim described the robber's black jacket as a "bomber jacket," and he also admitted that in his report he described the jacket as a "black jacket" rather than a "bomber jacket" or a "large black jacket." Officer Newbill initially said that the victim related that she had been locked in the cooler, staying there for ten to fifteen minutes, although the officer later said that the victim was not in the cooler when he arrived on the scene.

Officer Steven Story with the Jackson Police Department testified that he arrived at the restaurant with Officer Newbill. Upon arriving, Officer Story searched the restaurant while Officer Newbill began interviewing the victim. After Officer Story completed his search, he also spoke with the victim. He asked her if she recognized the robber. The victim said she did not. Officer Story then asked if anybody had been fired from the restaurant recently; when asked why he posed this question, Officer Story replied, "in my experience sometimes that's the way it happens. I've worked other robbery cases where that was the case." The victim replied that the defendant had been fired "about a week or so" before the robbery for drinking on the job. She stated that although the robber wore a mask over his face, preventing her from seeing the robber's face, the defendant "did match close to the description of this guy [who] had grabbed her." The victim related that the robber carried "a long knife"; Officer Story searched the restaurant, but none of the knives in the restaurant matched this description.

Officer Story said that the victim informed him that the robber "had on a black jacket, a black-type almost like a baseball cap, some type of mask over his face like a ski mask," black pants, and black gloves. Officer Story said that he did not ask the victim whether the robber resembled the defendant, but that the victim suggested the resemblance on her own.

On cross-examination, Officer Story said that the victim said that the color of the robber's mask "could have been a dark blue to a black." He also said that there was no indication that the victim suffered any injuries other than the bruising to her neck. The officer testified that he assumed that the robber took the knife used during the robbery with him when he left the restaurant. He also said that before he asked the victim about any employees who had been fired, the victim said that she was unable to recognize the robber.

Micki Moody, who was known by her maiden name of Micki Rhodes at the time of the incident, testified that she was the manager on duty at the Lone Star Steakhouse the night of November 27, 2005. She said that after the restaurant closed that night, she counted the day's receipts in the office. While she did that, the last two kitchen employees informed her that they were done working and were leaving the store. She walked into the restaurant's dining room, and after seeing the two employees leave, she returned to the office to finish her closing duties. She then returned to the dining room, where a man with a knife grabbed her and started pushing her toward the office. Moody said that the knife had a black handle and a blade that was eight to nine inches long. She testified that she screamed and "fought a little" with the assailant until he wrestled her onto the ground. The assailant then grabbed Moody by the neck and demanded the restaurant's money. The assailant then held her by the neck and turned her toward the restaurant's safe. She opened the safe, and the assailant took all the money from the safe. After taking the money, the assailant grabbed Moody by the neck and led her from the office. The two then went into the kitchen, where the assailant opened the door to a walk-in cooler and pushed Moody inside. Moody testified that she remained in the cooler for five to ten minutes before exiting the cooler and calling 911 from the office phone.

Moody testified that when the assailant confronted her, she had already counted the money the restaurant had taken in that day and prepared it for deposit. She said that this money, as well as the previous day's deposit and the money the restaurant generally kept on hand to make change in the normal course of business was stolen from the safe. Moody said that the restaurant's bank account was with First Tennessee Bank; she noted that "if [the restaurant] get[s] any change made from the bank . . . like a hundred dollars worth of ones or something[,] they wrap [the money] in a band that would say First Tennessee." She testified that some of the money taken from the safe was bundled in this manner. Moody said that she and the restaurant's general manager, who arrived at the restaurant after the police arrived, concluded that the assailant took approximately $5100 from the safe.

Moody said that she looked at the robber "somewhat" during the incident. She described the man's clothing as "completely black. At the first glance I know it was black pants, [and] a black jacket . . . [with] big pockets on the side and big buttons." She also noted that the assailant wore "a black mask of some kind," a black hat, black gloves, and black tennis shoes which had "no descriptive marks." She said that some time after the robbery, she met with Jackson Police Department Investigator Tyreece Miller, who showed her photographs of certain articles of clothing and bundles of money. These photographs were introduced into evidence at trial. Moody identified the black jacket, black pants, black shoes, and black gloves depicted in the photographs as the same ones that the assailant wore the night of the robbery. She said that the black hat and mask depicted in the

photographs were "consistent" with the type of clothing worn by the assailant, but she could not say for certain that these items were the ones worn by the assailant. Moody said that the money shown in the photographs was the money that was stolen from the safe the night of the robbery. She noted that the photographs depicted money bundled in paper bands marked "First Tennessee," which was the bank Lone Star used for its deposits. She also said that some of the money in the photographs was bundled with paper clips, which was consistent with Lone Star's business practice of bundling $25 in one-dollar bills with paper clips.

Moody testified that the defendant had been employed with Lone Star as a grill cook for approximately one year before being fired. She said that the defendant would have been familiar with the layout of the restaurant, including the office, kitchen, and cooler. She said that the assailant did not hesitate in leading her from the office to the cooler. Moody said that the assailant did not lock the cooler door when he placed her there, so she was able to escape on her own. She said she remained in the cooler for some time because she was unsure when the assailant would leave the restaurant.

Moody said she described the assailant's build to the police. She described the assailant as "tall, kind of broad shoulders. I don't know if I would stay stocky but, you know, not thin." She said that the robber's build was consistent with the defendant's build. She also said that she was able to hear the robber's voice, and based on the voice, she presumed that the robber was black and sounded as if he were in his forties or fifties. Moody testified that Story asked her if the defendant fit this description, and she replied that he did. However, she reiterated that her description of the robber's clothing and build, as well as her assumptions regarding the robber's race and age, were formed before the police asked her about anyone being fired from the restaurant.

Moody testified that the last two employees to leave the restaurant the night of the robbery were a dishwasher, Josh Irvin, and a cook, Lineal Green. She said that the kitchen workers were responsible for locking the restaurant's back door once they finished taking out the garbage. She said that Irvin, who she believed was eighteen years old, had worked at the restaurant for a few months before the robbery. She said that Irvin knew the defendant because the two men worked together at the restaurant. She said that Irvin left the restaurant approximately five minutes before the robbery and that Irvin was making a call on his cellular telephone as he left the restaurant.

On cross-examination, Moody admitted that she initially told Officer Story that she did not recognize the assailant. She also said that after Officer Story asked her about anyone being fired from the restaurant, the officer asked if the defendant fit her description of the assailant. Moody said that during the year the defendant worked at the restaurant as a grill cook, she spoke with him on several occasions.

She admitted that although she would have had "ample opportunity to be familiar with his voice," she was unable to tell the police that she recognized the assailant's voice as the defendant's.

Moody said that Irvin "clocked out" of the restaurant at 11:11 p.m. that evening, while the other person working in the kitchen that night, Lineal Green, clocked out at 11:03 p.m. She admitted that Irvin was "basically tall, broad-shouldered, [and] not stocky," and that this description was consistent with the physical description of the assailant that Moody gave to police. She admitted that when she dialed 911 to report the incident, she told the dispatcher that she believed the assailant was black, despite the fact that she did not see the assailant's face.

Regarding the assailant's clothing, Moody said that although in the 911 call and her preliminary hearing testimony she identified the robber's mask as a ski mask, she was unsure whether the mask was actually a ski mask. Moody described a ski mask as "a cloth mask that has the eyes and only the mouth cut out of it." She also said that although she described the assailant's jacket as a bomber jacket to police, she admitted that she "[did not] know exactly what a bomber jacket [was]." She also admitted that at the time of the incident, she was unable to provide any identifying features regarding the assailant's shoes. She also noted that workers at Lone Star wear blue jeans and a black t-shirt with the restaurant's logo on it and that workers in the kitchen also had the option of wearing black pants.

On redirect examination, Moody said that at the time of the robbery, she was uncertain of the assailant's identity, but after becoming "privy to other evidence in this case," she believed "unequivocally, beyond a reasonable doubt" that the defendant committed these offenses. She said that she saw the assailant approximately twenty seconds during the incident. She insisted that the jacket depicted in the photograph she was shown by police the day after the incident was the one the assailant wore during the robbery. She also reiterated that the assailant's voice sounded like that of an "older" African American man, which was consistent with the defendant and not consistent with Irvin. On recross-examination, Moody said that she could identify a black man by his voice.

Sergeant Robert Henson with the Jackson Police Department testified that the evening of the robbery, he responded to a radio dispatch concerning the robbery at the Lone Star restaurant. He first went to the restaurant, where he became aware of the details of the offense, including the suspect's physical description, which Sergeant Henson described as "a black male dressed all in black, wearing a black ball cap with a black jacket with large pockets with snaps on them." After Investigator Miller arrived, Sergeant Henson left the restaurant to continue his patrol shift, which was scheduled to end at 1:15 a.m.

Sergeant Henson testified that around the time his shift was to end, he was driving west on Ridgecrest Road near the intersection of Highland Avenue when he observed a man pushing a bicycle up a hill. Sergeant Henson testified that the man "matched the description" of the suspect in the robbery. Specifically, Sergeant Henson described the clothing as "a black ball cap, dark colored pants, and a black coat. What drew my attention was the pockets with the snaps on them." After passing the suspect, Sergeant Henson put out a radio call "to see if [there] were any units close so we could stop the subject and check him." Officers McMullen and Cole responded that they were in the area. Sergeant Henson turned back toward the individual, who by this time was riding his bicycle eastbound on Ridgecrest. Sergeant Henson and the two officers then "pulled over and stopped" the individual, whom Sergeant Henson identified in court as the defendant.

Sergeant Henson testified that when he and the other officers approached the defendant, he asked the defendant where he was coming from. Sergeant Henson noticed that the defendant was sweating, appeared nervous, and kept placing his hands in his pockets. The officers told the defendant to refrain from putting his hands in his pockets because they were concerned over the defendant possibly having weapons in his pockets. After a while, Officer Cole approached the defendant from behind and patted him down for weapons. During the search, Sergeant Henson saw the defendant's coat open up, at which point he observed "a large bulge in the front of his shirt that was kind of squared looking and I told Officer Cole about it." Officer Cole placed his hand on the bulge and "asked him what it was," to which the defendant replied that it was "his money." The officers discovered a black plastic bag containing some money, and Officer Cole took possession of the bag. Sergeant Henson testified that the police also found black gloves in one of the defendant's pockets.

On cross-examination Sergeant Henson said that while he was at the restaurant, he had overheard Moody describing the jacket as a black jacket with pockets that snapped. He said he had no idea why this description was not recorded in the 911 call or in any other police report.

Officer Edward McMullen with the Jackson Police Department testified that he was one of the two officers who responded to Sergeant Henson's call to assist with stopping the suspect. He said that he and Officer Cole, driving separate cars, arrived at the location where Sergeant Henson had observed the suspect. Officer McMullen recalled that he was the last officer to arrive on the scene, and by time he arrived, the other two officers were already speaking to the suspect, who was wearing a black leather jacket, black pants, and black sneakers. Officer McMullen saw Officer Cole pat down the suspect for weapons. He then saw Officer Cole grab a "large bulge" in the suspect's jacket or shirt, a bulge which turned out to be a bag containing "a large sum of money." Officer McMullen said

that some of the money was wrapped in "bank bands." He testified that the suspect, whom he identified in court as the defendant, was transported to the local jail, where his clothing was collected as evidence. The clothing, which was admitted into evidence at trial, included a black leather coat, two black "winter gloves," a black leather cap, a navy "long john" shirt, black jogging pants, a pair of navy blue polyester pants, black tennis shoes, a black t-shirt, black socks, a black belt, and two "stocking-type skullcaps." Officer McMullen said that the skullcaps to him looked like "a portion of . . . dark-colored pantihose." Officer McMullen said that the police also retrieved two wallets from the defendant, one of which was his, and the other containing "half of a driver's license" belonging to a white male.

On cross-examination, Officer McMullen said that at night, he would have been unable to see whether the defendant's jacket pockets had snaps on them. He also said that he would not have described the defendant's jacket as a bomber jacket. Officer McMullen said that there was no writing on the hat the defendant was wearing at his arrest. He explained that the mask recovered from the defendant did not have cutouts for a person's eyes and mouth, as would a ski mask.

Officer Royal Cole with the Jackson Police Department testified that he assisted Sergeant Henson and Officer McMullen in apprehending the suspect the morning after the robbery. The substance of his testimony largely mirrored that of the other two officers. Regarding the bulge in the defendant's shirt, Officer Cole testified that as he stood behind the defendant, patting him down for weapons, he noticed a "large bundle," which he thought may have been a bomb. Officer Cole discovered that the object was a bag of money, which he turned over to Investigator Miller once he arrived on the scene. He recalled that some of the money was wrapped in bank bands and some was bundled with paper clips.

On cross-examination, Officer Cole testified that before he received the call from Sergeant Henson regarding the suspect, he received a general "be on the lookout (BOLO)" call regarding the robbery at the restaurant. He said that the description of the suspect in the initial call was that of a man dressed in black. Officer Cole said he was uncertain whether the defendant was nervous or agitated because the police were "hassling" him. Officer Cole described the bundle he felt in the defendant's clothing was "medium," neither hard nor soft. The officer said that the bulge did not feel like a gun or a knife, and he also admitted that he did not know what a bomb felt like, or what it ought to feel like.

Investigator Tyreece Miller with the Jackson Police Department testified that while he was at the restaurant interviewing Moody, he received a call from Sergeant Henson stating that he had detained the defendant, who was carrying a large amount of money. After concluding his interview with the victim, Investigator Miller went to the scene where the three Jackson police officers were detaining the defendant in the back of a police car, a site which the investigator said

was approximately 2.3 miles from the restaurant. Officer Cole handed Investigator Miller a black bag containing a large amount of money, some of which was bundled in First Tennessee bank wraps. He then told the officers to transport the defendant to the police station, which they did. Investigator Miller said that "in the early morning hours" of November 28, 2005, he photographed the money that had been taken from the defendant. He noted that in addition to being wrapped in paper bands labeled with the First Tennessee name, some of the money was bundled with paper clips, a practice which Moody had described. Investigator Miller said that he recovered $4768 from the bag found on the defendant at his arrest.

Investigator Miller testified that in the defendant's wallet, the police located a piece of paper with a phone number and the name "Josh" written on it. In the course of his investigation, after the police made Irvin a suspect, Investigator Miller became aware of cellular phone calls that the defendant and Irvin had made between one another.

On cross-examination, Investigator Miller said that he wrote down Moody's statement. In the statement, Investigator Miller wrote that the assailant wore a bomber jacket with silver buttons and big pockets. However, he admitted that the jacket worn by the defendant at the time of his arrest did not have silver buttons on it. He also said that he did not consider the mask recovered from the defendant to be a ski mask, and he did not consider the defendant's jacket to be a bomber jacket, although Moody described the mask and jacket as such. He also said that the defendant's hat had no writing on it, despite the victim's statement that the assailant's hat could have "possibly" had yellow writing on it. Regarding the discrepancy between the amount of money the restaurant manager said was taken from the store and the amount found on the defendant, Investigator Miller said he was unsure as to why the discrepancy existed. He surmised that either the manager was mistaken about the amount of money taken or the defendant could have hidden or lost some of the money.

Investigator Miller said that the police developed Irvin as a suspect after the police received a call in which a complainant stated that "Irvin had made a comment to one of his employees that he knew that Lone Star was going to get robbed before it was robbed." Investigator Miller said that Irvin was indicted in this case but pled guilty to lesser charges. Investigator Miller said that he interviewed Irvin three times and that Irvin provided "a little bit of the truth" during each interview.

On redirect examination, Investigator Miller said that he believed that Irvin told him the truth regarding the defendant's involvement in the robbery. He also said that the differences between Moody's description of the assailant's clothing and the clothing the defendant was wearing at the time of his arrest did not lead him

to doubt Moody's credibility or exclude the defendant as a suspect. On recross-examination, Investigator Miller said that Moody initially told him that the assailant was wearing a black jacket. Investigator Miller asked Moody for more information, at which point she said that the defendant was wearing a bomber-style jacket with big pockets and silver buttons. He also said that Irvin was not identified as a suspect the night of the incident, and that Irvin later admitted his involvement in the Lone Star robbery.

Josh Irvin testified that in November 2005, he was employed as a dishwasher at the Lone Star Steakhouse in Jackson. In addition to washing dishes, he would take trash to the restaurant dumpster. Irvin said that when he took trash to the dumpster, he would prop the restaurant's back door open so he would not be locked out of the restaurant. Irvin said that the defendant, who had worked at the restaurant as a grill cook before being fired, was familiar with this procedure and with the layout of the restaurant.

Irvin testified that on the evening of November 27, 2005, while at work, he received a phone call from the defendant. In that call, the defendant informed Irvin that he was going to rob the restaurant and asked for Irvin's assistance. Irvin said that although the defendant's plan was "on [his] mind," he did not tell anyone at the restaurant about the defendant's plans. Irvin testified that he and the defendant placed "several calls back and forth." In one of the calls, the defendant told Irvin that he (the defendant) was on his way to the restaurant on a bike. In another call, which Irvin said took place after Moody clocked him out, the defendant asked Irvin how many people remained in the restaurant. Irvin responded that he, Green, and Moody were the only three people remaining in the restaurant. He further told the defendant that he and Green[3] were leaving the restaurant at that point.

Irvin testified that he pled guilty to facilitation of aggravated robbery and conspiracy to commit aggravated robbery. He said that he received an effective ten-year judicial diversion sentence, which included an eighteen-month sentence at the Madison County Penal Farm and the rest of the sentence on probation. Irvin confirmed that his criminal record could be expunged if he did "exactly what [he was] supposed to" do as part of his sentence, which included testifying against the defendant.

Irvin testified that when he took out the trash that evening, he left the back door propped open. He also said that after he and Green left the restaurant, he left his hat wedged inside the front door so that the door would not lock. He and Green

---

[3]Investigator Miller testified that Green was subpoenaed to testify at trial. However, Investigator Miller said that he was unsure whether Green had been served with the subpoena and did not know Green's current whereabouts.]

waited five to ten minutes for Irvin's stepfather, who agreed to give Green a ride home before taking Irvin home. After Irvin's stepfather agreed to give Green a ride home, Irvin went to the front door to retrieve his hat. At that time, he looked inside the restaurant, where he saw a man wearing a dark jacket and a mask over his face standing against a wall and looking "into the office door." Irvin said that he did not tell anyone about this person's presence in the restaurant.

After Irvin's stepfather picked up Irvin and Green around 11:15 p .m., they went to a Walmart located behind the Lone Star restaurant. Green and Irvin stayed near the front of the store while Irvin's stepfather went shopping in the store. After a while, Irvin heard sirens and saw police officers arrive. He and Green spoke to a police officer, who informed them that the Lone Star had just been robbed. This information prompted Irvin to call the defendant, who told Irvin that "he was long gone from Lone Star and that he was near the country club," which Irvin said was near the intersection of Highland Avenue and Vann Drive in Jackson. Irvin testified that after he and his stepfather arrived at their home shortly after midnight, he called the defendant again on his cellular phone. The defendant said that he needed a ride, which Irvin said he was unable to provide, given that he had already returned home.

On cross-examination, Irvin admitted that in June 2005, he was fired from his job at a Corky's restaurant because the manager had suspected Irvin of taking money from the restaurant. Irvin said that he was unsure whether he listed this employment on his Lone Star application, but he was certain that he did not mention his Corky's termination on the application.

Irvin recounted the eight phone calls between him and the defendant the evening of November 27 and the early morning of November 28. Irvin admitted that although he was "concerned" over the defendant's initial phone call to him around 4:30 p.m., in which the defendant outlined his plans to rob the restaurant, Irvin told nobody about the defendant's plans. He also said that he did not remember what he and the defendant talked about when he called the defendant at 5:37 p.m. Irvin said that when the defendant called him at 9:34 p.m., the defendant said that he was on his way to the restaurant on a bicycle. Irvin said that the defendant called him at 10:30 p.m., but Irvin did not recall the substance of that conversation. Irvin said that after this call, he called the defendant four times. At 10:59 p.m., he called the defendant but received no answer. At 11:08 p.m., the defendant asked Irvin how many people remained in the restaurant. Irvin called the defendant twice more after the robbery, at 11:26 p.m. and 12:05 a.m. Irvin said that he was unsure why he made these last four phone calls, though he said that perhaps he was "curious." Irvin also said that he made three phone calls to his house between 10:56 p.m. and 11:49 p.m., and that his mother called his cellular phone once during that period. Irvin also noted that at 11:38 p.m., he called an unknown number. He initially said that he was unsure to whom the phone number

belonged, but on redirect examination, he said that while he was waiting for his stepfather to finish shopping at Walmart, he called a girl he knew.

On redirect, Irvin also said that he had occasionally given the defendant a ride home from Lone Star while the two were employed there, and during the rides home, the two talked about grilling because Irvin eventually wanted to become a cook. Irvin said that he and the defendant became friendly, and based upon his "allegiance" to the defendant, his friend, he did not warn Moody about the defendant's robbery plans. Irvin said that he received no money from the defendant as part of the robbery, nor was he promised any money. Irvin reiterated that although he called the defendant as he was leaving the restaurant, the defendant asked Irvin about the people remaining in the restaurant. He also admitted that in his earlier statements to police, he was not entirely truthful. On recross-examination, Irvin admitted that in a December 5, 2005 statement to police, he had said that he had clocked out himself, which was not true. He also said that he provided police with incorrect times for the phone calls between him and the defendant, and he also lied to police about who initiated some of the calls.

Elvis Love, Irvin's stepfather, testified that he picked up Irvin and Green from the restaurant the night of the robbery. He said that he, Green, and Irvin went to Walmart, where he shopped while Green and Irvin waited near the front of the store. After Love finished his shopping, he dropped off Green at his house and then returned home. On cross-examination, Love said that he was unsure what time he picked up Irvin and Green from the restaurant, and he was also unsure how long he was at Walmart.

The defendant testified that he was employed at Lone Star for about one year as a grill cook. He said that he knew Irvin "for a few months," and that they had given each other rides home from the restaurant several times. The defendant offered his own account of the eight telephone conversations between him and Irvin that occurred the night of the robbery. He said that he placed the first call to Irvin at 4:29 p.m. The defendant said that Irvin had called him several days before the robbery asking about why he was terminated, and that the defendant was returning Irvin's call. He said that Irvin called him later that evening asking for a ride home. The defendant said that he called Irvin twice, at 9:34 and 10:30 p.m. The defendant said that both times, he was returning Irvin's call. He noted that Irvin called the defendant four times between 10:59 p.m. and 12:05 a.m. because Irvin "needed a ride real[ly] bad [ly]." The defendant insisted that he did not offer Irvin a ride home at any time that evening.

The defendant said that when he was stopped while riding his bicycle on Ridgecrest Road, he was "exercising." He said that he was wearing a black leather cap, a black leather coat, black jogging pants, and black tennis shoes. The defendant said that he was approached by "about five police cars," and that the

officers "bum rushed" and tackled him. The defendant said that the police took his clothing and that the clothing introduced into evidence at trial was the clothing he was wearing at his arrest. He insisted that his black jacket was not a bomber jacket and that it did not have silver buttons or snaps on its pockets. He said that his black leather hat had no writing on it, and he said that the police did not recover a skullcap, which he described as a stocking cap to keep his hair in place. Rather, he described the cap recovered by police as a stocking cap.

The defendant testified that the money the police took from him was a combination of his own money and some money that he had found in a used car lot. He said that the money he found in the bag was not bundled with paper clips or bank wraps. The defendant said that he told the police that he won the money gambling, but he admitted that this statement was a lie. The defendant accused Investigator Miller of threatening his life when the police interviewed him. He insisted that he did not rob the Lone Star restaurant or attack Moody, and he also stated that he did not know who Green was.

On cross-examination, the defendant said that he started his bicycle ride a few minutes after 11:00 p.m. He said that the police took $2200 of the defendant's money from his pockets and placed this money in the bag with the money he had found in the used car lot. The defendant insisted that he kept his money in his possession because he did not keep his money in a bank and he did not want to risk losing his money in a house fire. Regarding the "found money," the defendant said that while riding his bicycle, he observed a car make a U-turn, during which time a passenger in the car threw a dark plastic bag out the car window. Upon arriving at the discarded bag, he observed a wallet next to the bag, which led the defendant to look inside the bag and discover that the bag contained money. The defendant insisted that the money was not bundled in any way. The defendant said that he told the police that he had won the money gambling because he surmised that if the police believed this story, the police would not seize his money.

The defendant said that he was in possession of two stocking caps at the time the police confronted him. He wore one on his head and kept another in his pocket. The defendant explained that he was "a black man. Black people wear stocking caps all the time . . . . I was raised up wearing one to try to keep my hair looking neat." The defendant said that the police did not tell him to keep his hands out of his jacket pockets. Rather, the defendant insisted that upon seeing him, the police tackled him. The defendant said that he originally told police that he won the money in his possession gambling, but in a subsequent statement that was transcribed by police, the defendant said that he found the money. He also insisted that while the written statement noted that the defendant was walking his bicycle up a hill when the police stopped him, he told police that he was riding his bike when the police stopped him. The defendant admitted that he signed the written statement, but he also said that perhaps he "misread" the statement before signing

it. He also accused the police of keeping him in jail for three days before taking his statement.

Testifying as a rebuttal witness for the State, Investigator Miller said that he read the defendant his Miranda rights before the interview which produced the defendant's written statement, in which the defendant said that he was walking his bike at the time the police stopped him. He also said that the defendant indicated he understood those rights and waived them. Investigator Miller said that the defendant was not kept in jail three days before being interviewed by police. Rather, the interview took place around 5:50 the evening of November 28, the day after the robbery. On cross-examination, Investigator Miller said that he wrote out the statement, but he had the defendant review the statement for inaccuracies. Investigator Miller said that the defendant made a few revisions before signing the statement at 6:30 p.m. on November 28. On redirect examination, Investigator Miller said that he was unaware that the defendant had ever claimed that $2200 of the money found in the defendant's possession was the defendant's own money.

The jury convicted the defendant of one count of aggravated robbery, one count of conspiracy to commit aggravated robbery, and one count of especially aggravated kidnapping, as charged in the indictment. The defendant subsequently filed a timely notice of appeal.

*State v. Pittman*, 2009 WL 1025870 at *1-12.

On June 6, 2011, Pittman filed a *pro se* Petition for Post-Conviction Relief in the Madison County (Tennessee) Circuit Court ("MCCC"). (Pet. for Post-Conviction Relief, *Pittman v. State*, No. 06-161 (Madison Cnty. Cir. Ct.), Page ID1277-90, ECF No. 9-13.) The court appointed attorney Lee Sparks to represent Pittman in his post-conviction relief proceedings on June 23, 2011. (Order Appointing Counsel, *id.*, Page ID 1299, ECF No. 9-13.) On August 1, 2011, Pittman, through his counsel, filed an Amended Petition for Post-Conviction Relief. (Am. Pet. for Post-Conviction Relief, *id.*, Page ID 1310-14, ECF No. 9-13.) The court entered an order denying Pittman's post-conviction petition. (Order Dismissing Post-Conviction Pet., *id.*, Page ID 1316-20, ECF No. 9-13.) Pittman filed a Notice of Appeal to the TCCA on September 20, 2011. (Not. of Appeal, *id.*, Page ID 1322, ECF No. 9-13.) Pittman filed his brief on appeal to the

17

TCCA, arguing the sole issue of ineffective assistance of trial counsel. (Br. of Appellant to TCCA, *id*., Page ID 1369-1371, ECF No. 9-15.)

The TCCA summarized the evidence presented at the evidentiary hearing as follow:

At the evidentiary hearing, the petitioner testified that trial counsel, who had been hired by his son, met with him only two times prior to trial. He said counsel never discussed the evidence against him, other than the fact that he had been found with money, never discussed any trial strategy with him, and failed to investigate the case. He stated that trial counsel wanted him to accept a plea offer of twenty years, but he refused because he did not commit the robbery. In his opinion, counsel did not do a very good job representing him at trial.

Trial counsel, who said he was licensed to practice law in 2001, testified that at the time he was hired to represent the petitioner, approximately half of his practice consisted of criminal defense. The public defender's office originally represented the petitioner but approximately one month prior to trial, one of the petitioner's family members, Adrian Powell, contacted him about taking over the case. Trial counsel said that he discussed the short period before trial with Mr. Powell before he agreed to take the case, explaining that he might or might not be able to get a continuance, but if he did not, he would be ready for trial on the scheduled date.

Trial counsel testified that he met with the petitioner four different times before trial and was fully prepared to try the case. Although he did not record the total number of hours he spent, his practice anytime he met with a client in jail was to mark off the entire day for the trip and to spend at least half of the day at the jail. He stated that he and the petitioner therefore had lengthy conversations during which they discussed "anything and everything that there was to talk about." The case was fairly straightforward, and he could not think of anything he could have done differently in the case.

On cross-examination, trial counsel testified that he and the petitioner discussed everything that was related to the trial, including what his explanation would be for having "thousands of dollars on him in the early morning hours on the street in the middle of the rain, riding his bicycl[e] down the road." He said he felt that he had adequate time to investigate the case, which was why he did not initially ask for a continuance. However, a day or two before trial, the victim received a couple of letters purporting to be from the Federal Bureau of Investigation ("FBI") and the police department, which stated that the investigating police officer in the case was under investigation. He, therefore, asked for a continuance on the morning of trial, which was denied after a hearing. Trial counsel stated that he never investigated the source of the letters because at the hearing, someone from the FBI

testified that the agent who had purportedly written and signed the letter had not worked for the FBI in years and that the signature on the letter was not his. In addition, the letters contained grammatical errors, and it became clear at the hearing that there was no basis for the allegations contained in them.

On August 23, 2011, the post-conviction court entered an order denying the petition for post-conviction relief, finding that the petitioner had failed to meet his burden of showing that he received ineffective assistance of counsel. This appeal followed.

*Pittman v. State*, No. W2011-02024-CCA-R3-PC, 2012 WL 1656770, at *2-3 (Tenn. Crim. App. May 10, 2012).

The TCCA affirmed the MCCC's decision denying post-conviction relief, and Pittman's application for permission to appeal was denied by the Tennessee Supreme Court. *Id.*, *appeal denied* (Tenn. Sept. 27, 2012).

On July 18, 2011, Petitioner filed a *pro se* Petition for Writ of Habeas Corpus in Lauderdale County Circuit Court ("LCCC") in Lauderdale County, Tennessee, alleging that the indictment, which led to his three convictions, was defective. The LCCC denied the Petition for writ of habeas corpus, and the TCCA affirmed. *Pittman v. Steward*, No. W2011-01632-CCA-R3-HC, 2012 WL 2514909 (Tenn. Crim. App. July 2, 2012), *appeal denied* (Tenn. Oct. 17, 2012).

### B. Procedural History of Pittman's § 2254 Petition

On January 15, 2013, Pittman filed his *pro se* § 2254 Petition, accompanied with his five dollar ($5.00) habeas filing fee. (§ 2254 Pet. and Habeas Filing Fee, *Pittman v. Lester*, ECF Nos. 1 & 2.) On January 29, 2013, the Court ordered Respondent to file a response to the Petition and the state court record. (Order to Respond, *id.*, ECF No. 3.) Respondent submitted his Response (Ans., *id.*, ECF No. 8) and the State Court Record (Not. of State Court R., *id.*, ECF No. 9) on

March 22, 2013.  On April 9, 2013, Pittman filed a Reply to Respondent's Answer.  (Reply, *id.*, ECF No. 10.)

On June 26, 2013, Petitioner filed his first Motion for Leave to Amend his § 2254 Petition, arguing that his post-conviction counsel rendered ineffective assistance of counsel, in violation of his Sixth and Fourteenth Amendment rights.  (First Mot. for Leave to Amend § 2254 Pet., *id.*, ECF No. 11-1.)  On September 17, 2013, Pittman filed his second Motion for Leave to Amend, arguing ineffective assistance of trial and appellate counsel.  (Second Mot. for Leave to Amend § 2254 Pet., *id.*, Page ID 1535 ECF No. 12.)  The Court granted Pittman's first and second motions to amend on September 20, 2013 and directed Respondent to file a supplemental response to the amendments.  (Order Granting First & Second Mot. for Leave to Amend § 2254 Pet., *id.*, ECF No. 14.)  On February 5, 2014, Respondent filed his Supplemental Answer to the amendments.  (Suppl. Ans., *id.*, ECF No. 17.)  Pittman filed a Reply to Respondent's Supplemental Answer on February 28, 2014.  (Reply to Suppl. Ans., *id.*, ECF No. 18.)

## II.     PETITIONER'S FEDERAL HABEAS CLAIMS

In his § 2254 Petition, Pittman raises the following issues:

1. Whether the State court opinion regarding the unlawful search and seizure of the petitioner resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding?  (§ 2254 Pet., *id.*, Page ID 5, ECF No. 1.)

2. Whether the State court's opinion regarding the sentencing issue; i.e. length/consecutive; resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding?  (*Id.*)

3. Whether the State court's opinion regarding the ineffective assistance of trial counsel resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidenced presented in the State court proceeding?  (*Id.*)

4. Whether post-conviction counsel rendered ineffective assistance:

    (a) Whether post-conviction counsel was [ineffective] for failing to provide proof that trial counsel was [ineffective] since he failed to object to the petitioner wearing shackles in front of the jury, especially when the petitioner had to walk up to the witness stand and give testimony?   (*Id.*)

    (b) Whether post-conviction counsel was ineffective for failing to provide proof that trial counsel was [ineffective] when he failed to challenge the fact that there was suggestive identification procedures used in order to identify the evidence (i.e. money & clothes)?   (*Id.*)

    (c) Whether post-conviction counsel was [ineffective] in failing to argue whether trial counsel was ineffective due to the fact he failed to argue that the information retrieved out of the petitioner's wallet [was] obtained via a[n] illegal search and seizure? (*Id.*)

    (d) Whether post-conviction counsel was [ineffective] when he failed to provide proof that trial counsel was [ineffective] for failing to subpoena Leneau Green & Mona Murphy as rebuttal witnesses?   (*Id.* at Page ID 6.)

    (e) Whether post-conviction counsel was ineffective for failing to argue that trial counsel rendered ineffective assistance of counsel during sentencing.   (*See* First Am. § 2254 Pet., *id.*, Page ID 1529, ECF No. 11-1.)

5. Trial and appellate counsel rendered ineffective assistance of counsel by failing to properly handle Pittman's Fourth Amendment claim of illegal search and seizure.   (*See* Second Am. § 2254 Pet., *id.*, Page ID 1535, ECF No. 12.)

## III.    APPLICABLE LEGAL PRINCIPLES

The statutory authority for federal courts to grant habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").   A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."   28 U.S.C. § 2254(a).   As explained below, there are a number of legal

21

doctrines which apply to the analysis of this habeas petition.

## A. Exhaustion and Procedural Default

Twenty-eight U.S.C. § 2254(b) and (c) provide that a federal court may not grant a writ of habeas corpus on behalf of a state prisoner unless, with certain exceptions, the prisoner has exhausted available state remedies by presenting the same claim sought to be redressed in a federal court to the state courts. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). The petitioner must "fairly present"[4] each claim to all levels of state court review, up to and including the state's highest court on discretionary review, *Baldwin v. Reese*, 541 U.S. 27, 29 (2004), except where the state has explicitly disavowed state supreme court review as an available state remedy, *O'Sullivan v. Boerckel*, 526 U.S. 838, 847-48 (1999). Tennessee Supreme Court Rule 39 eliminated the need to seek review in the Tennessee Supreme Court in order to "be deemed to have exhausted all available state remedies." *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003); *see also Smith v. Morgan*, 371 F. App'x 575, 579 (6th Cir. 2010) (noting that the *Adams* holding promotes comity by requiring that state courts have the first opportunity to review and evaluate claims and by mandating that federal courts respect the duly promulgated rule of the Tennessee Supreme Court that recognizes the court's law and policy-making function and its desire not to be entangled in the business of simple error correction).

The procedural default doctrine is ancillary to the exhaustion requirement. *See Edwards v. Carpenter*, 529 U.S. 446, 452-53 (2000) (noting the interplay between the exhaustion rule and the procedural default doctrine). If the state court decides a claim on an independent and

---

[4]For a claim to be exhausted, "[i]t is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam). Nor is it enough to make a general appeal to a broad constitutional guarantee. *Gray v. Netherland*, 518 U.S. 152, 163 (1996).

adequate state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, a petitioner ordinarily is barred from seeking federal habeas review. *Wainwright v. Sykes*, 433 U.S. 72, 87-88 (1977); *see Coleman v. Thompson*, 501 U.S. 722, 729 (1991) (a federal habeas court will not review a claim rejected by a state court "if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment"). If a claim has never been presented to the state courts, but a state court remedy is no longer available (*e.g.*, when an applicable statute of limitations bars a claim), the claim is technically exhausted, but procedurally barred. *Coleman*, 501 U.S. at 732; *see Hicks v. Straub*, 377 F.3d 538, 551 (6th Cir. 2004) (the procedural default doctrine prevents circumvention of the exhaustion doctrine).

Under either scenario, a petitioner must show "cause" to excuse his failure to present the claim fairly and "actual prejudice" stemming from the constitutional violation or, alternatively, that a failure to review the claim will result in a fundamental miscarriage of justice. *Schlup v. Delo*, 513 U.S. 298, 322 (1995); *Coleman*, 501 U.S. at 750. The latter showing requires a petitioner to establish that a constitutional error has probably resulted in the conviction of a person who is actually innocent of the crime. *Schlup*, 513 U.S. at 321; *see House v. Bell*, 547 U.S. 518, 536-39 (2006) (restating the ways to overcome procedural default and further explaining the actual innocence exception).

### A. Standard for Merits Review

Section 2254(d) establishes the standard for addressing claims that have been adjudicated in state courts on the merits:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).   The petitioner carries the burden of proof for this "difficult to meet" and "highly deferential [AEDPA] standard," which "demands that state-court decisions be given the benefit of the doubt."   *Cullen*, 563 U.S. at 181 (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011), and *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)).[5]

Review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits.   *Cullen*, 563 U.S. at 181.   A state court's decision is "contrary" to federal law when it "arrives at a conclusion opposite to that reached" by the Supreme Court on a question of law or "decides a case differently than" the Supreme Court has "on a set of materially indistinguishable facts."   *Williams*, 529 U.S. at 412-13.[6]   An "unreasonable application" of federal law occurs when the state court "identifies the correct governing legal principle from" the Supreme Court's decisions "but unreasonably applies that principle to the facts of the prisoner's case."   *Id.* at 413.   Under this ground for relief, the state court's application of clearly established federal law must be "objectively unreasonable."   *Id.* at 409.   The writ may not issue merely because the habeas court, in its independent judgment, determines that the state court decision applied clearly established federal law erroneously or incorrectly.   *Renico v. Lett*, 559 U.S. 766, 773 (2010); *Williams*, 529 U.S. at 411.

---

[5]The AEDPA standard creates "a substantially higher threshold" for obtaining relief than a *de novo* review of whether the state court's determination was incorrect.   *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *William v. Taylor*, 529 U.S. 362, 410 (2000)).

[6]The "contrary to" standard does not require citation of Supreme Court cases "so long as neither the reasoning nor the result of the state-court decision contradicts them."   *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam); *see Mitchell v. Esparza*, 540 U.S. 12, 16 (2003) (same); *Treesh v. Bagley*, 612 F.3d 424, 429 (6th Cir. 2010) (same).

There is little case law addressing the standard in § 2254(d)(2) that a decision was based on "an unreasonable determination of facts." However, in *Wood v. Allen*, 558 U.S. 290, 301 (2010), the Supreme Court stated that a state-court factual determination is not "unreasonable" merely because the federal habeas court would have reached a different conclusion. In *Rice v. Collins*, 546 U.S. 333, 341-42 (2006), the Court explained that "[r]easonable minds reviewing the record might disagree" about the factual finding in question, "but on habeas review that does not suffice to supersede the trial court's . . . determination."[7]

"Notwithstanding the presumption of correctness, the Supreme Court has explained that the standard of § 2254(d)(2) is 'demanding but not insatiable.'" *Harris v. Haeberlin*, 526 F.3d 903, 910 (6th Cir. 2008) (quoting *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005)). "Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review.'" *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). A state court adjudication will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding. *Ayers v. Hudson*, 623 F.3d 301, 308 (6th Cir. 2010); *see Hudson v. Lafler*, 421 F. App'x 619, 624 (6th Cir. 2011) (same).

### B. Ineffective Assistance of Counsel Standard

A claim that ineffective assistance of counsel has deprived a movant of his Sixth Amendment right to counsel is controlled by the standards stated in *Strickland v. Washington*, 466

---

[7]In *Wood*, 668 U.S. at 293, 299, the Supreme Court granted certiorari to resolve whether, to satisfy § 2254(d)(2), a petitioner must establish only that the state-court factual determination on which the decision was based was "unreasonable," or whether § 2254(e)(1) additionally requires a petitioner to rebut a presumption that the determination was correct with clear and convincing evidence. The Court ultimately found it unnecessary to reach that issue. *Id.* at 300-01, 304-05. In *Rice*, 546 U.S. at 339, the Court recognized that it is unsettled whether there are some factual disputes where § 2254(e)(1) is inapplicable.

U.S. 668 (1984).   The benchmark for judging any claim of ineffectiveness is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.   *Id.* at 686.

To demonstrate deficient performance by counsel, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness."   *Id.* at 688.

> A court considering a claim of ineffective assistance must apply a strong presumption that counsel's representation was within the 'wide range' of reasonable professional assistance. [*Strickland*, 466 U.S.] at 689.   The challenger's burden is to show 'that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.' *Id*. at 687.

*Harrington*, 562 U.S. at 104.

To demonstrate prejudice, a prisoner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.[8]   "A reasonable probability is a probability sufficient to undermine confidence in the outcome."   *Id.*   "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' [*Id.*] at 693.   Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.' *Id*. at 687."   *Harrington*, 562 U.S. at 104 (citing *Strickland*, 466 U.S. at 687, 693); *see also Wong v. Belmontes*, 558 U.S. 15, 27 (2009) (per curiam) ("But *Strickland* does not require the State to rule out [a more favorable outcome] to prevail.   Rather, *Strickland* places the burden on the defendant, not the State, to show a 'reasonable probability' that the result would have been different.")

"Surmounting *Strickland*'s high bar is never an easy task."   *Padilla v. Kentucky*, 559 U.S.

---

[8]"[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant."   *Id.* at 697.   If a reviewing court finds a lack of prejudice, it need not determine whether, in fact, counsel's performance was deficient.   *Id.*

356, 371 (2010). When an ineffective assistance claim is reviewed under § 2254(d), the review is "doubly deferential." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). Federal courts must show caution when evaluating ineffective assistance claims under § 2254(d), because "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105.

## IV.     ANALYSIS OF PETITIONER'S CLAIMS

### A.  Claim 1: Illegal Search and Seizure

In Claim 1, Pittman argues that "the State court opinion regarding the unlawful search and seizure of the petitioner resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." (§ 2254 Pet., *Pittman v. Lester*, Page ID 6, ECF No. 1.)  He contends that the testimony and evidence presented prove that the officers who arrested him did so in violation of the United States Supreme Court decision in *Terry v. Ohio*, 392 U.S. 1 (1968).  Petitioner challenged the trial court's denial of the motion to suppress on direct appeal on the ground that "the trial court committed reversible error in denying Defendant's Motion to Suppress in the case at bar, because the evidence seized from the defendant was obtained without a warrant and without justification under any existing exception to the warrant requirement." (Br. of Appeal of Right, *State v. Pittman*, Page ID 1178, ECF No. 9-12.)

The TCCA summarized the testimony of the suppression hearing and denied Pittman's claim on the merits:

#### *Suppression Hearing Testimony*

At the suppression hearing, both Sergeant Henson and Officer Cole testified, with the substance of each officer's testimony largely mirroring that of the

27

testimony each man would give at trial. However, in addition to stating that the defendant matched the physical description of the suspect as provided by Moody, both officers testified that the defendant provided his name to the police before they began searching him. When asked on cross-examination, "what did you say to [the defendant] when you first exited the patrol car," Sergeant Henson said that he "started out just by asking for his name." Officer Cole, who was called as a defense witnesses, said that "at some point in the very beginning" of their interaction with the defendant, the police asked the defendant his name, which he provided. Both officers testified that the defendant had been identified as a person who had been fired from the restaurant where the robbery occurred. Both officers testified that they were aware that the victim had reported the assailant using a knife, so when the defendant kept placing his hands in pockets after being told to stop, the police decided to search the defendant for weapons.

At the conclusion of the hearing, the trial court denied the defendant's motion to suppress. The trial court found that the initial police stop of the defendant was proper in that the description of the suspect given by Moody "sufficiently matched this [d]efendant such that there were articulable facts such that reasonable suspicion was here, so that [the] stop was justified under the *Terry* case." The trial court further held that the officers' search of the defendant was justified given the officers' "credible" testimony that "Mr. Pittman [was] agitated and constantly putting his hands in his pockets . . . . [A]ny reasonable officer is going to be concerned in a situation like this because they knew that this person who robbed the Lone Star was armed with a knife . . . ." The trial court concluded its findings by stating that "once that was done and the money was found matching the description that had been given to the officers concerning what was taken from the restaurant along with all the other parts of the description of the suspect that matched up, I believe the arrest was also proper."

### *Standard of Review*

"[A] trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *State v. Odom,* 928 S.W.2d 18, 23 (Tenn. 1996). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Id.* Both proof presented at the suppression hearing and proof presented at trial may be considered by an appellate court in deciding the propriety of the trial court's ruling on a motion to suppress. *State v. Henning,* 975 S.W.2d 290, 299 (Tenn. 1998); *State v. Perry,* 13 S.W.3d 724, 737 (Tenn. Crim. App. 1999). However, the prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." *Odom,* 928 S.W.2d at 23. Furthermore, an appellate court's

review of the trial court's application of law to the facts is conducted under a de novo standard of review. *State v. Walton,* 41 S.W.3d 75, 81 (Tenn. 2001) (citations omitted).

Both the federal and state constitutions offer protection from unreasonable searches and seizures. *See* U.S. Const. amend. IV; Tenn. Const. art. I, § 7. "[T]he most basic constitutional rule in this area is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment-subject only to a few specifically established and well delineated exceptions.'" *Coolidge v. New Hampshire,* 403 U.S. 443, 454–55, 91 S. Ct. 2022, 2032, 29 L .Ed. 2d 564 (1971) (quoting *Katz v. United States,* 389 U.S. 347, 357, 88 S. Ct. 507, 514, 19 L. Ed. 2d 576 (1967)); *see also State v. Berrios,* 235 S.W.3d 99, 104 (Tenn. 2007). "Exceptions to the warrant requirement include searches incident to arrest, plain view, hot pursuit, exigent circumstances, and others, such as the consent to search." *Berrios,* 235 S.W.3d at 104 (citing *State v. Cox,* 171 S.W.3d 174, 179 (Tenn. 2005)). Fourth Amendment concerns attach to "all seizures of the person, including seizures that involve only a brief detention short of traditional arrest." *United States v. Brignoni–Ponce,* 422 U.S. 873, 878, 95 S. Ct. 2574, 2578, 45 L. Ed. 2d 607 (1975) (citation omitted); *see Terry v. Ohio,* 392 U.S. 1, 16–19, 88 S. Ct. 1868, 1877–79, 20 L. Ed. 2d 889 (1968)).

Additionally, our supreme court has held that "a police officer may make an investigatory stop when the officer has a reasonable suspicion, supported by specific and articulable facts, that a criminal offense has been or is about to be committed." *State v. Bridges,* 963 S.W.2d 487, 492 (Tenn. 1997) (citations omitted); *see also Terry,* 392 U.S. at 21. Our supreme court has also noted,

> In determining whether a police officer's reasonable suspicion is supported by specific and articulable facts, a court must consider the totality of the circumstances. *United States v. Cortez,* 449 U.S. 411, 417, 101 S. Ct. 690, 695, 66 L. Ed. 2d 621, 629 (1981). This includes, but is not limited to, objective observations, information obtained from other police officers or agencies, information obtained from citizens, and the pattern of operation of certain offenders. *Id.,* 449 U.S. at 418, 101 S. Ct. at 695, 66 L. Ed. 2d at 629. A court must also consider the rational inferences and deductions that a trained police officer may draw from the facts and circumstances known to him. *Terry,* 392 U.S. at 21, 88 S. Ct. at 1880, 20 L. Ed. 2d at 906.

*State v. Watkins,* 827 S.W.2d 293, 294 (Tenn. 1992). "Likewise, a frisk is warranted under *Terry* if the police officer has a reasonable suspicion based on specific and articulable facts that the suspect is armed." *Bridges,* 963 S.W.2d at 492 (citing *Terry,* 392 U.S. at 27).

        In this case, Sergeant Henson learned through his interaction with the victim that the assailant who robbed the Lone Star Steakhouse carried a knife and was dressed entirely in black, wearing a jacket with large pockets. He also learned that the victim identified the defendant as a person who had been fired from the restaurant recently. While on patrol after leaving the restaurant, he observed a man dressed entirely in black wearing a jacket with large pockets. When Sergeant Henson and Officers Cole and McMullen stopped the man, they asked for his name. Upon hearing the defendant identify himself, the police continued questioning him. When the defendant continued placing his hands in his pockets, even after the police requested that he stop doing so, the police, based on information that the assailant had used a knife during the robbery, conducted a "pat-down" for weapons. When the officers felt a bulge in the defendant's clothing, the police asked the defendant about the bulge. The defendant replied that the bulge was "his money," a statement which gave the police probable cause to conduct a full search and take the money from the defendant. In light of the totality of the circumstances, we conclude that the police had reasonable suspicion to detain the defendant, and that their search of the defendant was permissible under *Terry* and related cases. Concluding that the trial court did not abuse its discretion in denying the defendant's motion to suppress, we deny the defendant relief on this issue.

*Pittman*, 2009 WL 1025870, at *12-14.

        In his Answer, Respondent argues that Claim 1 is not cognizable in a § 2254 Petition, because "a search and seizure claim[] is not cognizable on federal habeas review." (Ans., *Pittman v. Lester*, Page ID 57, ECF No. 8.) Fourth Amendment issues are not cognizable in § 2254 petitions where the prisoner had a full and fair opportunity to litigate the issue in a state court. *Stone v. Powell*, 428 U.S. 465, 494 (1976). Here, Pittman had that opportunity for a court to consider his Fourth Amendment claim, having been afforded a suppression hearing and the ability to raise the issue on appeal. Therefore, Claim 1 is not cognizable in this § 2254 Petition.

        Claim 1 is without merit and is DISMISSED.

## B. Claim 2: Sentencing Error

In Claim 2, Pittman argues that the state court imposed an excessive sentence that was based on an unreasonable determination of the facts presented at trial. (§ 2254 Pet., *Pittman v. Lester*, Page ID 10, ECF No. 1.) He states that:

> [H]ad the court not unreasonably applied the misdemeanors as enhancement factors in sentencing the petitioner, the petitioner['s] sentence would be nothing more than a 25 year sentence, with that running consecutively to the life sentence already being served by the petitioner. However, the State court went even further unreasonably applying the facts when it ordered the three (3) sentences to be served consecutively to each other and also consecutive to the life sentence, resulting in a sentence of 66 years plus life.

(*Id*. at Page ID 12.) In support of his claim, Pittman argues that the sentence enhancements were imposed in violation of the "Sentencing Act the General Assembly of Tennessee enacted in July 2005" because the state improperly used prior misdemeanor convictions to enhance his sentence. (*Id*. at 11.)

Petitioner raised these same issues on direct appeal, arguing that "the trial court's sentencing of the defendant was unlawful and improper in that the trial [court] sentenced the defendant based on factors which were not found by the jury beyond a reasonable doubt." (Br. on Appeal of Right, *State v. Pittman*, Page ID 1195, ECF No. 9-12.) Pittman argued that his sentence was in violation of the Supreme Court decisions in *Blakely v. Washington*, 542 U.S. 296 (2004) and *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and in violation of the Tennessee Sentence Reform Act. (*See id*. at Page 1195-96.) The TCCA rejected the claim on its merits, reasoning as follows:

> On appeal, the defendant argues that the trial court imposed excessive sentences for his individual sentences, and that the trial court erred by imposing consecutive sentences. After reviewing the record, we conclude that the trial court committed no error in sentencing the defendant.

An appellate court's review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40–35–401(d) (2006). As the Sentencing Commission Comments to this section note, on appeal the burden is on the defendant to show that the sentence is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, the court may not disturb the sentence even if a different result were preferred. *State v. Fletcher,* 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

In conducting its de novo review, the appellate court must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf, and (7) the potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40–35–102, –103, –210 (2006); *see State v. Ashby,* 823 S.W.2d 166, 168 (Tenn. 1991); *State v. Moss,* 727 S.W.2d 229, 236–37 (Tenn. 1986).

### Length of Sentence

The defendant committed his offenses in November 2005; thus, he was sentenced under the revised sentencing act as enacted by the Tennessee General Assembly in July 2005. The act provides:

(c) The court shall impose a sentence within the range of punishment, determined by whether the defendant is a mitigated, standard, persistent, career, or repeat violent offender. In imposing a specific sentence within the range of punishment, the court shall consider, but is not bound by, the following advisory sentencing guidelines:

(1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40–35–210(c)(1)–(2) (2006).

The weight to be afforded an enhancement or mitigating factor is left to the trial court's discretion so long as its use complies with the purposes and principles of the 1989 Sentencing Act and the court's findings are adequately supported by the record. *Id.* § (d)-(f); *State v. Carter,* 254 S.W.3d 335, 343 (Tenn. 2008). "An appellate court is therefore bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in . . . the Sentencing Act." *Carter,* 254 S.W.3d at 346. Accordingly, on appeal we may only review whether the enhancement and mitigating factors were supported by the record and their application was not otherwise barred by statute. *See id.*

In imposing a sentence, the trial court may only consider enhancement factors that are "appropriate for the offense" and "not already . . . essential element[s] of the offense." Tenn. Code Ann. § 40−35−114 (2006). These limitations exclude enhancement factors "based on facts which are used to prove the offense" or "facts which establish the elements of the offense charged." *State v. Jones,* 883 S.W.2d 597, 601. Our supreme court has stated that "[t]he purpose of the limitations is to avoid enhancing the length of sentences based on factors the legislature took into consideration when establishing the range of punishment for the offense." *State v. Poole,* 945 S.W.2d 93, 98 (Tenn. 1997); *Jones,* 883 S.W.2d at 601.

At the sentencing hearing, the State proposed the following enhancement factors:

> (1) The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range;

> (2) The defendant was a leader in the commission of an offense involving two (2) or more criminal actors;

> (8) The defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community; and

> (13) At the time the felony was committed, one (1) of the following classifications was applicable to the defendant:

> (B) Released on parole.

Tenn. Code Ann. § 40−35−114(1)–(2), (8), (13)(B) (2006). Regarding mitigating factors, the defendant proposed two: "The defendant's criminal conduct neither caused nor threatened serious bodily injury," *see id.* § 40−35−113(1), and a

provision in the especially aggravated kidnapping statute whereby "[i]f the offender voluntarily releases the victim alive . . . such actions shall be considered by the court as a mitigating factor at the time of sentencing," *see id.* § 39-13-305(b)(2). The trial court found that all of the State's proposed enhancement factors applied and gave great weight to enhancement factor (13)(B). The trial court found that the mitigating factor established in the especially aggravated kidnapping statute applied but that the "neither causing nor threatening serious bodily injury" factor did not apply. The trial court sentenced the defendant as a Range II offender to nineteen years for his aggravated robbery conviction, nine years for his conviction for conspiracy to commit aggravated robbery, and thirty-eight years for his especially aggravated kidnapping conviction.

Initially, we note that the defendant argues that the trial court's application of sentence enhancement factors (2), (8), and (13)(B) violated his Sixth Amendment right to a jury trial. The United States Supreme Court has repeatedly held that "'[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.'" *Blakely v. Washington,* 542 U.S. 296, 301, 124 S. Ct. 2531, 2536, 159 L. Ed. 2d 403 (2004) (quoting *Apprendi v. New Jersey,* 530 U.S. 466, 490, 120 S. Ct. 2348, 2362–63, 147 L. Ed. 2d 435 (2000)). Furthermore, the Tennessee Supreme Court has held that our former sentencing act, one establishing presumptive minimum sentences that required the trial court to enhance sentences based on facts not found by the jury, violated the Sixth Amendment as interpreted by *Blakely* and its progeny. *Gomez II,* 239 S.W.3d at 740–41 (citing *Cunningham v. California,* 549 U.S. 270, 275, 127 S. Ct. 856, 860, 166 L. Ed. 2d 856 (2007)). However, Tennessee's revised sentencing act, which applies to the defendant's sentences in this case, is one in which "[i]mposition of a 'presumptive sentence' in the absence of enhancing and mitigating factors is no longer mandatory." *Gomez II,* 239 S.W.3d at 740 n. 8 (citing Tenn. Code Ann. § 40–35–210(c)). The Supreme Court has held that systems such as Tennessee's "permit judges genuinely 'to exercise broad discretion . . . within a statutory range'" and "encounter[ ] no Sixth Amendment shoal." *Cunningham,* 1594 U.S. at 294 (citing *United States v. Booker,* 543 U.S. 220, 233, 125 S. Ct. 738, 750, 160 L.Ed.2d 621 (2005)). As such, the defendant's Sixth Amendment-based argument regarding his sentences is without merit.

In this case, the sentences imposed by the trial court were within the statutorily-prescribed range. *See* Tenn. Code Ann. § 40–35–112(b)(1)–(3) (2006) (for defendant convicted as a Range II offender, sentence range for Class A felony is twenty-five to forty years; for Class B felony, twelve to twenty years; for Class C felony, six to ten years). Regarding the enhancement factors, the presentence report details that the defendant had an extensive history of previous convictions, including a 1984 armed robbery conviction for which he was on parole at the time of the instant offenses, a 1972 armed robbery conviction, and numerous

misdemeanor convictions for offenses including assault, disorderly conduct, vandalism, and theft. The record also supports application of the "leader in the commission of a felony involving two or more actors," as the defendant enlisted Josh Irvin's assistance in robbing the Lone Star restaurant. The record reflects that the trial court, as required by statute, considered both mitigating factors proposed by the defendant. The trial court applied only one of the mitigators, as was within its discretion. Because the record supports the trial court's application of enhancement factors, and because the defendant's sentences were within the appropriate ranges, we conclude that the sentences imposed by the trial court reflected an appropriate exercise of the trial court's discretion, and we will not disturb the sentences on appeal. *See Carter,* 254 S.W.3d at 346. The defendant is denied relief on this issue.

### *Consecutive Sentencing*

The trial court ordered that the defendant's three sentences in this case be served consecutively to each other, resulting in a total sentence of sixty-six years. The trial court also ordered that these sentences be served consecutively to his life sentence for a previous armed robbery conviction, a sentence for which he was on parole at the time he committed these offenses. *See* Tenn. R. Crim. P. 32(c)(3)(A). Regarding the previous conviction, the presentence report indicates that in 1984, the defendant was convicted of armed robbery and sentenced to life in prison. This court affirmed the defendant's conviction on appeal. *See State v. Larry Pittman,* C.C.A. No. 20, 1986 WL 4841 (Tenn. Crim. App. at Jackson, Apr. 23, 1986). The presentence report indicates that in March 2002 the defendant was granted parole, which was revoked in January 2006 following his arrest in this case. No order granting or revoking the defendant's parole appears in the record; however, despite this deficiency, the defendant does not attack the trial court's order that his sentences in this case be served consecutively to his sentence for armed robbery. As such, we will only address the defendant's contention that the trial court erred in ordering that his sentences in this case be served consecutively to each other.

The trial court ordered that the defendant's sentences in this case be served consecutively to each other based on the defendant's extensive criminal history and his status as a dangerous offender. *See* Tenn. Code Ann. § 40–35–115(b)(2), (4) (2006). Similarly, the defendant argues that the trial court's imposition of consecutive sentences violated his rights under the Sixth Amendment. However, the Tennessee Supreme Court has held that our statutory scheme, in which the trial court may impose consecutive sentences if it determines that certain statutory factors are established in the record by a preponderance of the evidence, does not offend a defendant's right to a jury trial under the Sixth and Fourteenth Amendments. *See State v. Allen,* 259 S.W.3d 671, 688–90 (Tenn. 2008).

The record reflects that the trial court explained in great detail how the record supported its findings that the defendant's extensive criminal record, detailed above, justified the imposition of consecutive sentences. Thus, the trial court's imposition of consecutive sentences based upon the defendant's criminal history was proper. Regarding the trial court's imposition of consecutive sentences based upon the defendant's status as a dangerous offender, our supreme court has held that when the trial court imposes consecutive sentences based on the defendant's dangerous offender status, the trial court must, "in addition to the application of general principles of sentencing," find "that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences must reasonably relate to the severity of the offenses committed." *State v. Wilkerson,* 905 S.W.2d 933, 939 (Tenn. 1995). The record reflects that the trial court did not make the required *Wilkerson* findings on the record. However, only one factor is needed for the trial court to act within its discretion to impose consecutive sentences. *See* Tenn. Code Ann. § 40–35–115, Sentencing Comm'n Cmts. Accordingly, the defendant is not entitled to relief on this issue.

*Pittman*, 2009 WL 1025870, at *18-21.

In his Answer, Respondent argues that Claim 2 is not cognizable in a § 2254 petition insofar as it arises from a violation of Tennessee law. In his Reply, Pittman insists that he failed to include case law or argue specific law because he was following the instructions given on Question 12 of the official form of the Petition Under § 2254 for Writ of Habeas Corpus, which states in parenthesis: "[d]o not argue or cite law. Just state the specific facts that support your claim." (*See* Reply, *Pittman v. Lester*, Page ID 1510-11, ECF No. 10). In support of Claim 2, he contends that *Blakely* and *Apprendi* further support his argument that his sentence was imposed in error.

Pursuant to 28 U.S.C. § 2254(a), a federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." Error in the application of state law is not cognizable in a federal habeas proceeding. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("it is not the province of a federal

habeas court to reexamine state-court determinations on state-law questions"); *Pulley v. Harris*, 465 U.S. 37, 41 (1984) ("A federal court may not issue the writ on the basis of a perceived error of state law."). Although Pittman did not initially raise federal constitutional issues in his § 2254 Petition, he did supplement his claim in his Petition with the same federal constitutional issues he raised in his direct appeal to the TCCA; i.e. *Blakely* and *Apprendi*. Thus, Claim 2 is cognizable in this § 2254 petition.

Pittman maintains that the state court unreasonably applied the facts of the case presented at trial to his sentence and improperly applied enhancement factors to his sentence in direct violation of *Apprendi* and *Blakely*. The reasons Tennessee's sentencing scheme is consistent with *Apprendi* and *Blakely* are addressed in the opinion of the TCCA on direct appeal. *See Pittman*, 2009 WL 1025870, at *1-20.[9]

Petitioner cannot satisfy his burden of demonstrating that the decision of the Tennessee Court of Criminal Appeals was contrary to, or an unreasonable application of, clearly established federal law. In *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), the Supreme Court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable

---

[9]Although the Supreme Court in *Williams v. Taylor* recognized, in *dicta*, the possibility that a state-court decision could be found to violate the "unreasonable application" clause when "the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply," 529 U.S. at 407, the Supreme Court expressed a concern that "the classification does have some problems of precision," *id.* at 408. The *Williams* Court concluded that it was not necessary "to decide how such 'extension of legal principle' cases should be treated under § 2254(d)(1)," *id.* at 408-09. To date, the Supreme Court has not had occasion to revisit the issue. *See Williams v. Coyle*, 260 F.3d 684, 699-700 (6th Cir. 2001); *Sheppard v. Bagley*, 604 F. Supp. 2d 1003, 1097 n.8 (S.D. Ohio 2009), *aff'd*, 657 F.3d 338 (6th Cir. 2011), *cert. denied sub nom. Shepard v. Robinson*, 132 S. Ct. 2751 (2012).

doubt." In *Blakely v. Washington*, 542 U.S. 296, 303 (2004) (emphasis omitted), the Supreme Court clarified that "the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." Both *Apprendi* and *Blakely* involved the imposition of sentences beyond the statutory maximum for the offense of conviction on the basis of factors found by a sentencing judge. In *Cunningham v. California*, 549 U.S. 270, 274-75 (2007), the Supreme Court held that California's determinate sentencing law, which assigned to the trial judge authority to find facts that expose the defendant to an "upper term" sentence, violated the Sixth Amendment. The decision in *Cunningham* was based on the definition of "statutory maximum" that was stated in *Blakely*. *Id.* 275.

Pittman contends that the trial court improperly applied enhancement factors to his sentence and increased his sentence beyond the statutory minimum without cause. Specifically, he states that:

> The State court properly reasoned that petitioner as a Range II offender could have been sentenced for the Class A felony from [2]5 to 40 years, for the Class B felony 12 to 20 years and for the Class C felony 6 to 10 years. However, the State court having determined the potential span of years available, the court must have then imposed a specific determinate sentence. This determinate sentence must begin at the statutory minimum which is called the presumptive sentence. In the instant case that would have been respect[ively] 25 years on the Class A, 12 years for the Class B, and 6 years for the Class C.

(§ 2254 Pet., *Pittman v. Lester*, Page ID 12, ECF No. 1.)

As to the length of the sentencing, Pittman acknowledges that the court appropriately categorized him as a Range II offender under Class A felony, Class B felony, and Class C felony classifications. Even when the enhancement factors (1), (2), (8), and (13)(B) were included in the calculation of his sentencing, his sentences were within the statutory range as detailed in T.C.A.

§ 40-25-112(b)(1)-(3). For Count 1, aggravated robbery, a Class B felony, which includes a range of twelve to twenty years, Pittman received a nineteen year sentence. (*See* J., State v. Pittman, Page ID 141, ECF No. 9-1.) For Count 2, conspiracy to commit aggravated robbery, a Class C felony, which has a range of six to ten years, he received a nine year sentence. (*See id.* at Page ID 142.) For Count 3, especially aggravated kidnapping, a Class A felony, which holds a range of twenty-five to forty years, Petitioner received a thirty-eight year sentence. (*See id*. at Page ID 143.) Thus, neither a *Blakely* nor an *Apprendi* analysis is triggered in determining whether the court erred in imposing the length of his sentence.

Pittman's position on his consecutive sentencing is foreclosed by the Supreme Court's decision in *Oregon v. Ice*, 555 U.S. 160, 164 (2009), although not cited by the TCCA, but which held that the Sixth Amendment is not implicated when a state sentencing scheme constrains a trial judge's discretion to impose consecutive sentences by requiring him to find certain facts before he can do so. The Supreme Court's decision includes the following statement:

> Most States continue the common-law tradition: They entrust to judges' unfettered discretion the decision whether sentences for discrete offenses shall be served consecutively or concurrently. In some States, sentences for multiple offenses are presumed to run consecutively, but sentencing judges may order concurrent sentences upon finding cause therefor. Other States, including Oregon, constrain judges' discretion by requiring them to find certain facts before imposing consecutive, rather than concurrent, sentences. It is undisputed that States may proceed on the first two tracks without transgressing the Sixth Amendment. The sole issue in dispute, then, is whether the Sixth Amendment, as construed in *Apprendi* and *Blakely*, precludes the mode of proceeding chosen by Oregon and several of its sister States. We hold, in light of historical practice and the authority of States over administration of their criminal justice systems, that the Sixth Amendment does not exclude Oregon's choice.

*Id.* at 163-64.

Tennessee law is similar to Oregon law in that it requires a judge to find certain facts before imposing consecutive sentences. Tennessee law provides that, "[i]f a defendant is convicted of

more than one (1) criminal offense, the court shall order sentences to run consecutively or concurrently as provided by the criteria in this section."  T.C.A. § 40-35-115(a). A judge can order that an offender's sentences run consecutively if the judge finds, by a preponderance of the evidence, that:

> ….
>
> (2) The defendant is an offender whose record of criminal activity is extensive;
>
> ….
>
> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high;
>
> ….

*Id.* § 40-35-115(b). In this case, the sentencing judge found that factors (2) and (4) were present. *See Pittman*, 2009 WL 1025870, at *20.[10]

Therefore, Claim 2 is without merit and is DISMISSED.

## C.  Claim 3: Ineffective Assistance of Trial Counsel

In Claim 3, Pittman argues that the facts relied on by the state court to find that his trial counsel did not render ineffective assistance of counsel were an unreasonable determination of the evidence presented.   Specifically Petitioner contends that his trial counsel erred in the following ways:

> (1) He failed in challenging the testimonies of Miki Moody, Tyreece Miller, Bobby Henson, and Phillip Thomas.
> (2) He failed to properly investigate the exculpatory evidence, i.e. the letter received by the victim of the corruption in the Jackson Police Department.

---

[10]Other district courts in Tennessee, applying *Ice*, have denied relief on similar claims. *See Guartos v. Colson*, No. 3:12-cv-0048, 2013 WL 247415, at *52 (M.D. Tenn. Jan. 23, 2013); *Grunder v. Easterling*, No. 4:09-cv-22, 2010 WL 3724867, at *22 (E.D. Tenn. Sept. 16, 2010).

(*See* § 2254 Pet., *Pittman v. Lester*, Page ID 14-16, ECF No. 1.)

In his Answer, Respondent contends that "[b]ased on the evidence in the record, the court's determination as to Pittman's claim was not contrary to, or an unreasonable application of, clearly established federal law as decided by the United States Supreme Court, nor an unreasonable determination of the facts in light of the evidence." (Ans., *id.*, Page ID 59, ECF No. 8.) Respondent further argues that the TCCA properly applied the *Strickland* standard when determining the analysis of Pittman's ineffective assistance of counsel claims. In his Reply, the inmate maintains that he is not arguing that the TCCA improperly applied *Strickland*, but that the TCCA's decision was based on an unreasonable determination of the facts. (*See* Reply, *id.*, Page ID 1512, ECF No. 10.)

On appeal of his Petition for Post-Conviction Relief, Pittman averred the sole issue of whether the MCCC erred in denying his petition was that his "trial counsel failed to adequately prepare for trial and failed to sufficiently investigate all facts and issues related to the case." (Br. of Appellant to TCCA, *Pittman v. State*, Page ID 1364, ECF No. 9-15.) The TCCA rejected this claim and made the following determination:

> The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. *See* Tenn. Code Ann. § 40–30–110(f) (2006). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. *See Tidwell v. State,* 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. *See Henley v. State,* 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is *de novo,* with no presumption of correctness. *See Ruff v. State,* 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo,* with a presumption of correctness given only to the post-conviction court's findings of fact.

*See Fields v. State,* 40 S.W.3d 450, 458 (Tenn. 2001); *Burns v. State,* 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *see State v. Taylor,* 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee).

The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad v. State,* 938 S.W.2d 363, 369 (Tenn. 1996) (citing *Strickland,* 466 U.S. at 688; *Baxter v. Rose,* 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the test is satisfied by showing a reasonable probability, *i.e.,* a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694.

The petitioner contends that trial counsel provided ineffective assistance by failing to adequately meet with him prior to trial, failing to discuss trial strategy or possible defenses, and failing to adequately investigate his case prior to and following the trial. With respect to the latter contention, he argues that trial counsel should have investigated the possible exonerative evidence contained in the letters received by the alleged victim and that his failure to do so prejudiced the case.

However, trial counsel's testimony, which was specifically accredited by the postconviction court, established that counsel met with the petitioner on four

different occasions, had extensive discussions with him about the evidence and possible defenses, thoroughly investigated the case, and was fully prepared for trial. Trial counsel also explained his failure to pursue the allegations in the letters received by the victim, testifying that he was satisfied from the evidence presented at the hearing that the letters were not authentic and their allegations without merit. We conclude, therefore, that the post-conviction court properly found that the petitioner failed to meet his burden of demonstrating that he received ineffective assistance of counsel.

*Pittman*, 2012 WL 1656770, at *3-4.

When asked at the Petition for Post-Conviction hearing on direct examination how he prepared for the case, Benjamin Mayo, who represented Pittman at trial and on direct appeal, stated the following:

> I met with Mr. Pittman at West Tennessee State Penitentiary -- I believe it was in Henning, I think -- at least twice that I can show in my notes; I believe three times, actually. One was on September 25th of 2006; one was on September 8th of 2006; and one was on September -- I show a contract signed by Mr. Pittman and myself on September 1st of 2006. And as Mr. Pittman said, I also met with him over here at the jail once he was brought over here. So that would be approximately four times.

> I know any time I ever scheduled to go to meet clients in criminal defense cases at prison I would almost always mark out a full day of time to go meet with them and I'd be there for at least half a day.

> I don't have notations of exactly how many hours I spent with him, but we would have talked about anything and everything that there was to talk about and had exhausted avenues for discussion before I left.

> I would never have cut short a conversation and said, "I've got to go back home," or anything like that.

(Pet. for Post-Conviction Hr'g Tr., *Pittman v. State*, Page ID 1345-46, ECF No. 9-14.)

Mayo furthered explained on direct examination his trial strategies during the discovery process before trial and his preparation for the post-trial motions and the brief for direct appeal. On cross-examination, the following exchange occurred between Mayo and Pittman's post-conviction counsel, Lee Sparks, regarding his trial strategy and specifically regarding the

alleged whistleblower letters received before trial:

> Q.          Due to the nature of the charges a month's not much time to prepare, is it?

> A.          It's not.  I mean, it doesn't sound like much.  And, generally speaking, in most cases when you get hired you get hired early on in the case and you have plenty of time to do that.

> But I was prepared.  There's nothing that additional -- I don't know think of -- I can't think of anything that additional time would have allowed me to do that I wasn't able to do.

> Q.          Well, did you discuss trial strategy with Mr. Pittman?

> A.          Yes.  We discussed everything that was related to the trial; what witnesses were expected to say, what his explanation was for having thousands of dollars on him in the early morning hours on the street in the middle of the rain, riding his bicycling down the road.

> Q.          Okay.  Did you -- Do you feel like you had adequate time to investigate other options?

> A.          I think I had adequate time to investigate the only options that were known or available to me.

> Q.          Okay.  Now, then, you said that you were going to -- when you first got retained by Mr. Powell[11] that you would explore filing a Motion to Continue.  Did you actually --

> A.          If I thought it was necessary.

> Q.          Olay.  I guess I missed that in your testimony.  Did you actually do that?

> A.          I believe what happened -- Actually, as it transpired, I was ready for trial on the day that it had been scheduled.  And then what happened wasn't related to me not being prepared, but the day before trial or a couple days before trial -- I'm not sure of the timeline exactly -- a letter turned up -- Actually, I think the victim in the case received a letter in the mail.  I'm not -- I don't recall the specifics of how this worked out.

---

[11]As explained during direct examination, Mayo was hired by a relative of Pittman's to represent him at trial.

But there was a letter that was purported to be from a FBI or TBI agent indicating that there was an investigation of the police officer in the case for fabricating evidence in the case and that the police officer -- and then there was a letter -- there was another letter that indicated that the police officer was investigating this officer or something like that.

And these things turned up a couple of days before the trial, so I do remember asking for a continuance the morning of trial.

Q.          Okay.   Was there a hearing on that issue?

A.          Yes.

Q.          Okay.   And what was the result of that hearing?

A.          It was denied.

Q.          Okay.   Following the trial did you follow up on the investigation of these letters?

A.          I didn't, because at the hearing the TBI or FBI agent who allegedly signed the letter came, my recollection is, or someone came on his behalf and he -- he was -- he had not been employed there for years and had not signed the letter.

There were the kinds of grammatical errors in the letter that looked like it was not legitimate.

Q.          It was the agent that purportedly signed the letter, is that what you said?

A.          I don't specifically recall.   It wasn't anybody I called, you know.   I think the State actually had them there to verify that this was a false letter.

Q.          Uh-huh.   Well, could it have been an FBI agent that was actually just not the signatory of the letter, but perhaps --

A.          That's right.   When the -- At that hearing it became pretty clear that there was no basis whatsoever for what was alleged in the letter.

Q.          Okay.   But you didn't follow up with the actual signatory of the letter or the purported signatory of the letter, did you.

A.          No.

Q.        And you didn't -- So we -- At this point we don't know whether that letter is -- We can't confirm completely that that letter is inauthentic?

A.        I can't.

(*Id*. at Page ID 1352-56.)

In this case, the TCCA examined the post-conviction hearing testimony of Pittman and Mayo and the evidence presented at trial to determine whether trial counsel rendered ineffective assistance of counsel and found that Mayo had not.    Here, Mayo, as recounted by the TCCA, met with Pittman at least four times before trial and explained his trial strategy with Pittman.    He reviewed all evidence pertinent to the case and presented it to the court in defense of his client.

It seems that Petitioner's main contention for his ineffective assistance of trial counsel claim is that Mayo did not fully investigate the validity of the two alleged whistleblower letters received by the victim.    However, as Pittman explained during the post-conviction hearing, counsel filed a motion for continuance once he was notified about the letters and a hearing was held on the first day of trial.    During the hearing on the motion to continue, the following occurred:

MR. THOMPSON:[12]        Your Honor, please, yesterday afternoon I received a call from Investigator Tyreece Miller, who indicated that the alleged victim in this case . . . Micki Moody . . . received two letters, purportedly one of them being purportedly from the FBI and the other purportedly being from the Jackson Police Department.

Just in a nutshell, Investigator Miller's investigation of these letters indicated that they were in -- which -- All right.   The letters alleged fabrication in this case.

THE COURT:        In this particular case?

---

[12]James W. Thompson was the Assistant District Attorney General assigned to the criminal case at trial.

MR. THOMPSON:     In this particular case.   One of them from the Jackson Police Department is purportedly from Sergeant Bobby Henson, who is a witness subpoenaed in this case. And he is present this morning.   And it basically indicates that Sergeant Henderson was influenced to tell untruths by other officers and indicates his opinion that Mr. Pittman was not the person who robbed Lone Star Restaurant.

It is not signed but it is a typed letter, and it's typed Sergeant Bobby Henson, and it's purportedly on Jackson Police Department letterhead.

\*          \*          \*

The other letter is reportedly from the FBI and on the surface of it appears to be on FBI letterhead and is signed. And underneath the signature is typed in Mr. Phillip W. Thomas, Special Agent in charge of East Tennessee.   And this letter is addressed specifically to Micki C. Rhodes, the alleged victim, and basically states that the Jackson Police Department is under investigation for wrongdoing in this particular case.   And it specifically mentions the letter from Sergeant Bobby Henson.

\*          \*          \*

[Micki Rhodes] received those at her job at Lone Star Steakhouse.   She's still employed there where the alleged robbery took place.

\*          \*          \*

And she received them yesterday.   I'm not sure what time.

But she contacted the police department.   And once Investigator Miller became aware of it he investigated, got ahold of the two letters, and had been working on this ever since.

(Trial Tr., *State v. Pittman*, Page ID 167-70, ECF No. 9-2.)

Special Agent Todd McCall from the FBI office in Jackson, Tennessee; Sergeant Bobby Henson; and Investigator Tyreece Miller testified and evidence was presented by the parties during

47

the hearing that pointed to various inconsistences, misspellings, and misstatements of facts in the

letters.   Based on the evidence and testimony presented, the trial judge delivered the following

ruling:

THE COURT:                              All right. Counsel, I'm ready to rule on this motion.

Let me say, number one, this whole thing infuriates me.  I'm not accusing Mr. Pittman or obviously not Mr. Mayo of being involved in this, but this is outrageous, as far as I'm concerned, to try to tamper with the case we have pending here, and especially on the day before trial.

Mr. Mayo, you did exactly what you should have done as far as filing a Motion for Continuance.   But based on what I've heard this morning, I'm going to overrule that Motion for Continuance.

If I allow a Motion to Continuance based on this, then I have a feeling we'll have a lot more letters sent in a day or two before a trial when things are pending in this district.

So I'm making a finding that these letters are a fabrication based on the evidence I've heard.    And obviously neither the FBI nor the Jackson Police have sent these letters admitting that there's some kind of fabrication of evidence in this case.

And I guess the second question Mr. Mayo hadn't asked, but I'm sure he will, is as to whether he can cross-examine witnesses who testify about these letters.

Of course, the answer is no. The State deserves a fair trial, just like the Defendant does.   And obviously if we get into this and the Defendant got a not guilty because of it, I couldn't fix it.   So this will not be referred to in any way whatsoever during the trial.

If, you know, Mr. Mayo further investigates this and I find out I am wrong for some reason, we can always set it aside and redo it. . . .

(*Id.* at Page ID 183-85.)

As noted above, Pittman does not argue that the TCCA improperly applied *Strickland* but that the TCCA based its decision on an unreasonable determination of the facts. Here, it is evident that the TCCA relied on a reasonable determination of the facts. In its decision, the TCCA highlighted the following to determine that Pittman's trial attorney did not render ineffective assistance of counsel: (1) trial counsel met with Pittman on numerous occasions to discuss the case; (2) trial counsel discussed the evidence and trial strategy with Pittman; and (3) trial counsel prepared for trial adequately. *See Pittman*, 2012 WL 1656770, at * 4. The TCCA acknowledged that trial counsel stated that he failed to investigate the letters fully, but only because he believed the letters were truly unauthentic. *Id*.

Each of the facts cited by the TCCA is also supported by the record. Petitioner's trial counsel stated at the post-conviction hearing that he met with Pittman approximately four times before trial began. (*See* Pet. for Post-Conviction Hr'g Tr., *Pittman v. State*, Page ID 1345, ECF No. 9-14.) His trial counsel also stated numerous times on the record that he met with his client to discuss trial strategy and possible defenses and that he was fully prepared for trial. (*See id.* at Page ID 1352-53.) Lastly, Pittman's trial counsel explained in detail his reasoning for not further investigating the alleged whistleblower letters sent to the victim that purported to be from the FBI and TBI. (*See id*. at Page ID 1353-56.) However, even if this Court were to question Pittman's trial counsel's failure to investigate the letters, it is evident from the trial judge's ruling and the witnesses presented during the motion for continuance that the evidence was more than sufficient to prove that the letters were not authentic. (*See* Trial Tr., *State v. Pittman*, Page ID 167-70, 183-85, ECF No. 9-2.)

Because Petitioner specifically argues that he is not challenging the TCCA's decision based on an unreasonable application of clearly established federal law, but, instead, on the grounds of an unreasonable determination of the facts in light of the evidence presented at the state court proceeding, this Court finds Pittman's arguments to be without merit. The TCCA properly determined and applied the facts of the case to the inmate's ineffective assistance of trial counsel claim.

Therefore, Claim 3 is without merit and is DISMISSED with prejudice.

**D. Ineffective Assistance of Trial and Appellate Counsel: Claim 5**

In Claim 5, Pittman submits that his trial and appellate counsel, Benjamin Mayo, rendered ineffective assistance of counsel, because he failed to properly present arguments to suppress evidence presented at trial. Specifically, Pittman states that,

> Trial and appellate counsel for the Petitioner rendered ineffective assistance of counsel in the improper and inadequate presentation of the Petitioner's State Court 4th Amendment Claim that the initial stop which lead to his arrest and subsequent search was illegal and produced evidence which should have been subject to suppression at trial which resulted in a decision that was contrary to and involved an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States and resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

(Second Am. § 2254 Pet., *Pittman v. Lester*, Page ID 1535, ECF No. 12.)

Petitioner concedes that he did not present this argument to the TCCA, but argues that his procedural default should be excused because his post-conviction counsel failed to raise this issue during the post-conviction proceedings and before the TCCA. Pittman cites one U.S. Supreme Court case, *Minnesota v. Dickerson*, 508 U.S. 366 (1993) and one Tennessee Supreme Court case, *State v. Nicholson*, 188 S.W.3d 649 (Tenn. 2006) to further support his arguments that his trial and

appellate counsel rendered ineffective assistance of counsel. (*See* Second Am. § 2254 Pet., *Pittman v. Lester*, Page ID 1537-40, ECF No. 12.)

Respondent counters that Pittman has failed to properly exhaust Claim 5, because it was never presented before the TCCA and that the two cases he cites are distinguishable from the facts of this case. (*See* Suppl. Ans., *id.*, Page ID 1558-59, ECF No. 17.) Respondent also argues that Pittman's reliance on *Martinez* is flawed because *Martinez* does not apply to Tennessee. In his Reply, Pittman insists that the Sixth Circuit decision in *Sutton v. Carpenter*, 745 F. 3d 787, 795-96 (6th Cir. 2014), proves that *Martinez* and the Supreme Court decision in *Trevino v. Thaler*, 133 S. Ct. 1911 (2013), applies to Tennessee. (*See* Reply to Suppl. Ans., *Pittman v. Lester*, Page ID 1594, ECF No. 18.)

Claim 5 of Pittman's ineffective assistance of trial and appellate counsel claims was not presented to the TCCA. His claims are considered to be exhausted because of his procedural default, and he has no avenue remaining for presentation of the claims given the state statute of limitations on state post-conviction relief. This procedural default operates as a complete and independent procedural bar to federal habeas review of Claim 5.

In order to survive this procedural defect, Petitioner would have to show cause that he should be excused from failing to present these claims on appeal by showing actual prejudice or by showing that a failure to review his claims would result in a fundamental miscarriage of justice. To demonstrate a fundamental miscarriage of justice, the inmate would have to show he is actually innocent of the crimes he was convicted of. Pittman does not argue that he is actually innocent. However, he maintains that he would be actually prejudiced if his failure to raise this claim of ineffective assistance of counsel was not excused because of the ineffectiveness of his

post-conviction counsel.

Pittman's claim of ineffective assistance of trial and appellate counsel cannot establish cause for his procedural default because this claim is procedurally defaulted. The Supreme Court has explained that even though ineffective assistance of counsel can be a cause for a procedural default, the exhaustion doctrine, which is "principally designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings," generally requires that a claim of ineffective assistance be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default. *Murray v. Carrier*, 477 U.S. 478, 488-89 (1986).

Petitioner did not avail himself of his post-conviction remedies to exhaust this claim of ineffective assistance by his trial and appellate attorney. Attorney error cannot constitute cause where the error caused a petitioner to default in a proceeding in which he was not constitutionally entitled to counsel, *e.g.* a discretionary appeal or state post-conviction proceeding. *See Coleman v. Thompson*, 501 U.S. 722, 751-53 (1991). Pittman has not established cause and prejudice for his procedural default and presents no tenable claim of factual innocence. Thus, he cannot avoid the procedural bar erected by the state post-conviction statute of limitations and cannot seek federal habeas relief on Claim 5.

"There is no constitutional right to an attorney in state post-conviction proceedings. Consequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings." *Coleman*, 501 U.S. at 752. Attorney error cannot constitute "cause" for a procedural default "because the attorney is the petitioner's agent when acting, or failing to act, in furtherance of the litigation, and the petitioner must bear the risk of attorney error." *Id.* at 753.

Thus, where the State has no constitutional obligation to ensure that a prisoner is represented by competent counsel, the petitioner bears the risk of attorney error. *Id.* at 754.[13]

In 2012, the Supreme Court issued its decision in *Martinez v. Ryan*, 132 S. Ct. 1309, 1320 (2012), which recognized a narrow exception to the rule stated in *Coleman* "[w]here, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding . . . ." In such cases, "a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance of counsel if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." *Id.* The Supreme Court also emphasized that "[t]he rule of *Coleman* governs in all but the limited circumstances recognized here . . . . It does not extend to attorney errors in any proceeding beyond the first occasion the State allows a prisoner to raise a claim of ineffective assistance at trial, even though that initial-review collateral proceeding may be deficient for other reasons." *Id.* at 1320. The requirements that must be satisfied to excuse a procedural default under *Martinez* are as follows:

> (1) the claim of "ineffective assistance of trial counsel" was a "substantial" claim; (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim"; and (4) state law *requires* that an "ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding."

*Trevino*, 133 S. Ct. at 1918 (emphasis and revisions in the original).

---

[13]*See also* 28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254.").

*Martinez* arose under an Arizona law that does not permit ineffective assistance claims to be raised on direct appeal. *Martinez*, 132 S. Ct. at 1313. In its subsequent decision in *Trevino*, 133 S. Ct. at 1921, the Supreme Court extended its holding in *Martinez* to states in which a "state procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal . . . ." Thus, the decision in *Trevino* modified the fourth requirement stated by *Coleman* for overcoming a procedural default.

Ineffective assistance of state post-conviction counsel can establish cause to excuse a Tennessee prisoner's procedural default of a substantial federal habeas claim that his trial counsel was constitutionally ineffective. *Sutton*, 745 F. 3d at 795-96. To be "substantial" under *Martinez*, a claim must have "some merit" based on the controlling standard for ineffective assistance of counsel. *Martinez*, 132 S. Ct. at 1318.

*Martinez* elaborated on what it meant for a claim to be "substantial":

When faced with the question whether there is cause for an apparent default, a State may answer that the ineffective-assistance-of-trial-counsel claim is insubstantial, *i.e.*, it does not have any merit or that it is wholly without factual support, or that the attorney in the initial-review collateral proceeding did not perform below constitutional standards.

*Id.* at 1319. *Martinez* requires that a petitioner's claim be rooted in "'a potentially legitimate claim of ineffective assistance of trial counsel.'" *Cook v. Ryan*, 688 F.3d 598, 610 (9th Cir. 2012) (quoting *Lopez v. Ryan*, 678 F.3d 1131, 1138 (9th Cir. 2012), *cert. denied*, 133 S. Ct. 55 (2012)). The petitioner must show a "substantial" claim of ineffective assistance, and this requirement applies as well to the prejudice portion of the ineffective assistance claim. *McGuire v. Warden*, *Chillicothe Corr. Inst.*, 738 F.3d 741, 752 (6th Cir. 2013), *cert. denied*, 134 S. Ct. 998 (2014); *see*

*Hoak v. Idaho*, No. 1:09–CV–00389–EJL, 2013 WL 5410108, at *7 (D. Idaho Sept. 25, 2013) ("*Martinez* requires the district court to review but not determine whether trial counsel's acts or omissions resulted in deficient performance and in a reasonable probability of prejudice, and to determine only whether resolution of the merits of the claim would be debatable among jurists of reason and whether the issues are deserving enough to encourage further pursuit of them."); *see also Gunter v. Steward*, No. 2:13–CV–00010, 2014 WL 2645452, at *13 (M.D. Tenn. June 13, 2014) ("[I]n many habeas cases seeking to overcome procedural default under *Martinez,* it will be more efficient for the reviewing court to consider in the first instance whether the alleged underlying ineffective assistance of counsel was 'substantial' enough to satisfy the 'actual prejudice' prong of *Coleman*."). The Supreme Court and the Sixth Circuit have not provided guidance as to how district courts reviewing habeas petitions are to implement the rulings in *Martinez and Trevino*. *See id*. at *12.

*Martinez* and *Trevino* cannot excuse Pittman's default of his ineffective assistance of counsel claims. *Martinez* is limited to ineffective assistance of trial counsel claims. Therefore, he is not entitled to *Martinez* relief, with regard to his ineffective assistant of appellate counsel claim and has not presented any evidence to justify review of these claims to prevent an actual prejudice or a fundamental miscarriage of justice.

As to his claims of ineffective assistance of trial counsel, Petitioner is not entitled to relief because he cannot meet the four factor test of *Martinez*. Specifically, Pittman has not shown a substantial claim of ineffective assistance of trial counsel. He argues that his trial counsel rendered ineffective assistance of counsel by failing to properly handle the claim that his Fourth Amendment rights were violated. Specifically, Pittman argues that,

> Trial and appellate counsel for the petitioner rendered ineffective assistance of counsel in the improper and inadequate presentation of the petitioner's state court 4th amendment claim that the initial stop, which lead to his arrest and subsequent search was illegal and produced evidence which should have been subject to suppression at trial . . .

(Second Am. § 2254 Pet., *Pittman v. Lester*, Page ID 1535, ECF No. 12.)

The inmate has never presented this ineffective assistance of trial counsel claim before the court in any initial state collateral review proceedings. Before trial, Petitioner's counsel filed a motion to suppress on May 2, 2006 in MCCC, arguing that Pittman's Fourth Amendment rights against unreasonable search and seizure were violated.   (*See* Mot. to Suppress, *State v. Pittman*, No. 06-161, Page ID 94, ECF No. 9-1.)   Specifically, trial counsel outlined several factors of Pittman's arrest that violated his Fourth Amendment rights:

1. The search was made without the issuance of a lawful search warrant.

2. The property was illegally seized without a warrant.

3. The search violated the Defendant's reasonable expectations of privacy.

4. The search was without the consent of the Defendant.

5. The search was made in the absence of exigent circumstances.

6. The property seized was not in "plain view" because the objects seized were not themselves in plain view, the objects were not discovered inadvertently.

7. The seizure, search and ultimate arrest of the Defendant was made without probable cause to believe that a felony had been committed **by the Defendant**.

8. The search of Defendant's person was not incident to a lawful arrest nor was there was not probable cause to conduct the illegal search.

(Memo. of Law for Mot. to Suppress, *id.*, Page ID 97, ECF No. 9-1) (original emphasis).

A hearing was held on the motion to suppress on June 9, 2006, and on June 16, 2006, the MCCC denied Pittman's motion, holding as follows:

Specifically the Court finds the clothing description given by the alleged victim to the police that matched the victim's clothing provided articulable facts that provided a reasonable stop under *Terry v. Ohio*, 392 U.S. 1, 885 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

Furthermore, the defendant's actions, agitation, repeatedly putting his hands in his pockets even after being told not to do so, and the knowledge of the police that the robber had a knife, justified a pat down. Furthermore, the Court find[s] the discovery of the cash bundle matching money taken in the robbery justified the defendant's arrest. The Court find[s] the policemen acted reasonably.

(Order Denying Mot. to Suppress, *id.*, Page ID 103, ECF No. 9-1.)

Although Pittman has never presented this claim under a theory of ineffective assistance of counsel, he did submit the claim under a theory of trial court error on direct appeal. The underlying claim of the illegal search and seizure was resolved on its merits by the TCCA on direct appeal. However, as this Court has stated in the analysis of Claim 1, *supra* pp. 30-31, a Fourth Amendment issue is not cognizable in a § 2254 petition where the prisoner had a full and fair opportunity to litigate the issue in a state court.

Pittman has also not provided any evidence that had his post-conviction counsel raised this claim on appeal to the TCCA, the result would be any different than it was when presented under a theory of trial court error. He has not presented any credible proof from which the Court may conclude trial counsel performed deficiently and, as a result, Pittman was prejudiced. He is not entitled to *Martinez* or *Trevino* relief for Claim 5.

Claim 5 is barred by Pittman's procedural default and DISMISSED with prejudice.

**E. Ineffective Assistance of Post-Conviction Counsel: Claims 4(a)-(e)**

In Claims 4(a)-(e), Petitioner avers that his post-conviction counsel, Lee Sparks, rendered ineffective assistance of counsel by failing to "present any evidence at the evidentiary hearing to prove [additional] claims [of ineffective assistance of trial counsel]." (§ 2254 Pet., *Pittman v.*

*Lester*, Page ID 16, ECF No. 1.)   He concedes that these claims were not presented before the TCCA but insists that the Supreme Court decision in *Martinez*, 132 S. Ct. at 1309, should excuse his procedural default.   Respondent contends that Pittman's claims are procedurally defaulted and that his default cannot be excused because *Martinez* does not apply in Tennessee.   (*See generally* Ans., *id.*, Page ID 59-65, ECF No. 8.)   Specifically, Respondent argues that,

> The petitioner's argument for relief in light of *Martinez* is without merit because *Martinez*, by its own terms, does not apply to states such as Tennessee, where a defendant may raise ineffective-assistance claims on direct appeal.

(*Id.* at Page ID 62.)   In his Reply, Petitioner contends that *Martinez* does apply in Tennessee and supports his claim with case law within the Sixth Circuit, namely *Landrum v. Anderson*, No. 1:96-cv-641, 2012 WL 5309223 (S.D. Ohio Oct. 26, 2012) and from several facts from the state court proceedings.   (*See generally* Reply, *id.*, ECF No. 10.)

Pittman had the opportunity to provide testimony and evidence on these issues during the post-conviction proceedings but chose not to.   Additionally, he did not present these claims to the TCCA in his post-conviction appeal.   (*See* Br. of Appellant to TCCA, *Pittman v. State*, Page ID 1369-1371, ECF No. 9-15.)   The sole issue on appeal Pittman chose to argue was that "Trial counsel failed to adequately meet with Mr. Pittman, discuss trial strategy and possible defenses, or adequately investigate Mr. Pittman's case prior to and following trial."   (Br. of Appellant to TCCA, *id.*, Page ID 1369, ECF No. 9-15.)   Post-conviction appellate counsel exercised his discretion to limit the brief to the TCCA to the strongest argument.[14]   Furthermore, the holding of *Martinez* does not encompass claims that post-conviction appellate counsel was ineffective.   *See*

---

[14]*See Smith v. Murray*, 477 U.S. 527, 536 (1986) (the failure to raise a non-frivolous issue on appeal does not constitute *per se* ineffective assistance of counsel, as "[t]his process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy").

*Martinez*, 132 S. Ct. at 1319 ("*Coleman* held that an attorney's negligence in a postconviction proceeding does not establish cause, and this remains true except as to initial review collateral proceedings for claims of ineffective assistance at trial."); *see also Hodges v. Colson*, 727 F.3d 517, 531 (6th Cir. 2013), *reh'g and reh'g enbanc denied* (Feb. 14, 2014) ("Under *Martinez*'s unambiguous holding our previous understanding of *Coleman* in this regard is still the law - ineffective assistance of post-conviction counsel cannot supply cause for procedural default of a claim of ineffective assistance of appellate counsel.").

Similar to the analysis above in Claim 5, *supra* pp. 52-58, Pittman did not avail himself of his post-conviction remedies to exhaust his claims of ineffective assistance of trial counsel and is therefore procedurally barred from seeking federal habeas relief on Claims 4(a)-(e). However, ineffective assistance of state post-conviction counsel can establish cause to excuse his procedural default of a substantial federal habeas claim that his trial counsel rendered ineffective assistance of counsel. *See Sutton*, 745 F.3d at 795-96; *see also supra* pp. 52-58. For the reasons explained below, Pittman has not shown a substantial claim of ineffective assistance of counsel.

### 1. Claims 4(a), (b), and (d): Trial counsel failed in his trial strategy

In Claims 4(a), (b), and (d), Pittman alleges that his post-conviction counsel was ineffective for failing to argue that his trial counsel was ineffective for raising various tactical and strategic decisions during trial. Specifically, he argues trial counsel should have: (a) objected to Pittman wearing handcuffs in front of the jury during trial; (b) challenged the identification procedures to identify specific evidence; (d) subpoenaed Leneau Green & Mona Murphy as rebuttal witnesses. (*See* Reply, *Pittman v. Lester*, Page ID 1517-19, 1521-22, ECF No. 10.) In support of Claim 4(a), Pittman submits that "[t]rial counsel should have reasonably known that the

petitioner was being forced to appear guilty by wearing shackles." (*See id*. at Page ID 1517.)   In support of Claim 4(b), Pittman contends that "[t]rial counsel should have reasonably known that the evidence used as identification in the instant case (i.e. money & clothes when arrested) . . . were in violation of his due process rights due to the fact that they were identified by suggestive means."   (*See id.* at Page ID 1518.)   Lastly, in support of Claim 4(d), Pittman insists that "[t]rail [sic] counsel should have reasonably known that in order to impeach Joshua Irvin's testimony and lead the jury to believe the defenses theory, trial counsel had to subpoena Leneau Green & Mona Murphy as witnesses." (*See id.* at Page ID 1521.)

Pittman has not provided any witness affidavit or documentation that demonstrates that his trial counsel's tactical decisions were either deficient or prejudicial under the *Strickland* analysis of ineffective assistance of counsel claim.   He has not demonstrated that counsel's tactical decisions fell below an objective standard of reasonableness.   *Strickland*, 466 U.S. at 688. Petitioner simply states conclusory statements that argue if his trial counsel had "reasonably known" to make various decisions during trial, the outcome would have been different. However, Pittman does not bolster his arguments with citation to the record or any supporting evidence.   When evaluating counsel's performance, the Court is mindful of the *Strickland* Court's instructions that "[t]here are countless ways to provide effective assistance of counsel.   Even the best criminal defense attorneys would not defend a particular client in the same way."   *Id.* Consequently, Pittman has not presented any credible proof from which the Court may conclude counsel performed deficiently and as a result, he was prejudiced.   *Martinez* and *Trevino* cannot excuse Petitioner's default of this claim.

Pittman is not entitled to *Martinez* and *Trevino* relief for Claims 4(a), (b), and (d).

2. <u>Claims 4(c): Trial counsel failed to protect Pittman's Fourth Amendment rights</u>

In Claim 4(c), Petitioner alleges that his post-conviction counsel was ineffective for failing to argue that trial counsel did not argue that the information found in his wallet was obtained in violation of his Fourth Amendment rights as an illegal search and seizure.    (*See* Reply, *Pittman v. Lester*, Page ID 1520, ECF No. 10.)    Pittman argues that "[t]rial counsel reasonably should have known that when Investigator Miller obtained the petitioner's wallet without a search warrant, this was violative of his due process rights, and thus any information obtained within that wallet was subject to the fruits of the poisonous tree doctrine."    (*See id*.)    Although this issue was not raised in the form of an ineffective assistant of counsel claim, it was presented to the TCCA on direct appeal and in Pittman's § 2254 Petition as an error in the trial court's reasoning. Before the TCCA and in his instant § 2254 Petition, Pittman argued that the court erred in finding that the police did not execute an unlawful search seizure on his person and his personal effects.    The underlying argument has been properly resolved by the TCCA and by this Court above in the analysis of Claim 5, *supra* pp. 50-58.

The ineffective assistance of counsel claim is without merit.    A motion to suppress was argued during the trial proceedings and the issue of the trial court's alleged error in denying the motion to suppress during trial was argued by trial and appellate counsel. Therefore, Pittman has not provided credible evidence demonstrating that his trial counsel's arguments at trial and on appeal amount to deficient performance or prejudiced him.    Like the analysis above for Claims 4(a), (b), and (d), *supra* pp. 60-61, *Martinez* and *Trevino* cannot excuse Pittman's default of Claim 4(c).

### 3. Claim 4(e): Trial counsel failed to object to improper enhancement factors at sentencing

In Claim 4(e), Petitioner maintains that his post-conviction counsel was ineffective for failing to argue that his trial counsel failed to object at sentencing and on direct appeal that the trial court applied improper enhancement factors to his sentence, in violation *Apprendi v. New Jersey*, 530 U.S. 466 (2000). (*See* First Am. § 2254 Pet., *Pittman v. Lester*, Page ID 1529, ECF No. 11-1.) Although this issue was not raised in the form of an ineffective assistant of counsel claim, Pittman presented the issue before the TCCA on direct appeal and in the instant § 2254 Petition as an error in the trial court's reasoning on the length and consecutiveness of Pittman's sentencing.

Before the TCCA and in his instant § 2254 Petition, Pittman argues that the court erred in imposing an excessive sentence and in imposing consecutive sentences. The underlying has been properly resolved by the TCCA and by this Court in the analysis of Claim 2, *supra* pp. 30-41.

The ineffective assistance of counsel claim is without merit. Petitioner's trial and appellate counsel presented this argument during sentencing and on appeal. Pittman has not provided credible evidence demonstrating that his trial counsel's arguments at trial and on appeal amount to deficient performance or prejudiced him. Like the analysis above for Claims 4(a), (b), and (d), *supra* pp. 60-61, *Martinez* and *Trevino* cannot excuse his default of Claim 4(e).

Therefore, Pittman is not entitled to *Martinez* relief for Claims 4(a)-(e). He has not presented any evidence to justify review of these claims to prevent a fundamental miscarriage of justice. *Murray*, 477 U.S. at 495-96. Issues Claims 4(a)-(e) are barred by Petitioner's procedural default and DISMISSED with prejudice.

## V.    CONCLUSION

Because all issues raised by Pittman are either barred by the doctrines of exhaustion and procedural default or are without merit, the petition is DISMISSED with prejudice.   Judgment shall be entered for Respondent.

## VI.    APPEAL ISSUES

There is no absolute entitlement to appeal a district court's denial of a § 2254 petition. *Cockrell*, 537 U.S. at 335; *Bradley v. Birkett*, 156 F. App'x 771, 772 (6th Cir. 2005).   The Court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a § 2254 petitioner.   Rule 11, Rules Governing Section 2254 Cases in the United States District Courts.   A petitioner may not take an appeal unless a circuit or district judge issues a COA.   28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1).

A COA may issue only if the petitioner has made a substantial showing of the denial of a constitutional right, and the COA must indicate the specific issue or issues that satisfy the required showing.   28 U.S.C. §§ 2253(c)(2) & 3.   A "substantial showing" is made when the petitioner demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'"   *Cockrell*, 537 U.S. at 336 (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)); *Henley v. Bell*, 308 F. App'x 989, 990 (6th Cir. 2009) (per curiam) (same).   A COA does not require a showing that the appeal will succeed.   *Cockrell*, 537 U.S. at 337; *Caldwell v. Lewis*, 414 F. App'x 809, 814-15 (6th Cir. 2011) (same).   Courts should not, however, issue a COA as a matter of course.   *Bradley*, 156 F. App'x at 773 (quoting *Slack*, 537 U.S. at 337).

In this case, there can be no question that the claims in this petition are barred by procedural default or are without merit. Because any appeal by Petitioner on the issues raised in this petition does not deserve attention, the Court DENIES a certificate of appealability.

For the same reasons it denies a certificate of appealability, the Court determines that any appeal would not be taken in good faith. It is therefore CERTIFIED, pursuant to Fed. R. App. P. 24(a), that any appeal in this matter would not be taken in good faith, and leave to appeal *in forma pauperis* is DENIED.[15]

**IT IS SO ORDERED**, this 31st day of March 2016.

s/ J. DANIEL BREEN
CHIEF UNITED STATES DISTRICT JUDGE

---

[15]If Petitioner files a notice of appeal, he must pay the full $505 appellate filing fee or file a motion to proceed *in forma pauperis* and supporting affidavit in the Sixth Circuit Court of Appeals within thirty (30) days of the date of entry of this order. *See* Fed. R. App. P. 24(a)(5).